### In re CHURCHILL MORTGAGE INVESTMENT CORP., Debtor.

**Barbara Balaber–Strauss, as Trustee of Churchill Mortgage Investment Corp., et al., Plaintiff,**

v.

**Sixty–Five Brokers, Defendants.**

#### No. 97 B 20967 (ASH).

United States Bankruptcy Court, S.D. New York.

Dec. 26, 2000.

---

Serchuk & Zelermyer, LLP, by Benjamin Zelermyer, White Plains, for the Chapter 7 Trustee.

Barr & Rosenbaum, by Harvey S. Barr, Spring Valley, NY, Rattet & Pasternak, LLP, by James B. Glucksman, Harrison,

NY, Grant, Weinhaus, LLP, by Harold B. Tevelowitz, Valhalla, NY, Larraine Feiden, Scott B. Feiden, Pearl River, Alan M. Simon, Suffern, NY, for Moving Defendants.

Morrison Cohen Singer & Weinstein, LLP, by Thomas R. Califano, New York City, for Official Committee of Unsecured Creditors.

James F. Jordan, Voorhees, NY, Pro Se.

## DECISION GRANTING BROKER-DEFENDANTS' MOTIONS TO DISMISS

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

The Chapter 7 Trustee (the "Trustee" or "Plaintiff") of the Churchill Debtors (as described below) commenced sixty-one adversary proceedings[1] against individuals and a few entities ("Brokers" or "defendants") who had been hired to originate mortgages for or solicit investors in one or more of the Churchill companies. The Trustee seeks to recover commissions aggregating over $5 million paid by the Debtors to the Brokers for these services during the six-year period 1991–1997 (the

"Relevant Period"). The complaints, all of which are substantially identical, allege that the Churchill companies collectively were operated as a fraudulent "Ponzi" scheme[2] and were insolvent during the Relevant Period. The Trustee does not assert that any of the Brokers had any knowledge of the Ponzi scheme, or that the Brokers' own activities were fraudulent, unlawful or wrongful in any respect. The gravamen of the Trustee's claims seems to be that the Debtors' Ponzi scheme

> was fueled and perpetuated by the Brokers' activities in originating mortgages and soliciting investors. In providing a substantial portion of Churchill's actual revenues and in fostering the appearance of legitimate business operations, the Debtors' mortgage origination activities played an essential role in the Ponzi scheme. (Trustee's Memorandum at 2)

The legal predicates for the Trustee's claims are the Trustee's avoidance powers under the Bankruptcy Code, 11 U.S.C. §§ 544, 547, 548 and 550 and the New York Debtor & Creditor Law ("D & CL") §§ 271, 272, 273, 274, 275 and 276.

[1] The names of the defendants and adversary proceeding numbers are as follows: ANF Financial Inc. 00–2130A; Douglas R. Bailey 00–2109A; Marvin Barcham 00–2062A; Michael Beyer 00–2053A; Jack Bloom 00–2131A; Robert F. Bond 00–2142A; Nicholas Caniano 00–2065A; Daniel J. Cantor 00–2102A; Steven G. Cappello 00–2135A; Dean Colomban 00–2121A; Lisa M. Culhane 00–2048A; Janet Dadamo 00–2106A; Milan David 00–2049A; James Ellison 00–2132A; Akiva N. Feinsod 00–2128A; Ernest Fidanza 00–2111A; Michael Gang 00–2051A; Edward Goldstein 00–2110A; Sidney Goldstein 00–2141A; Michael Gross 00–2066A; Abby Gross 00–2144A; Michael P. Harris 00–2064A; Abe Holtzman 00–2129A; Michael Howley 00–2052A; Sadako Huber 00–2140A; Philip Jaeger 00–2068A; James Jordan 00–2125A; Thelma Julis 00–2139A; Alvin J. Kalish 00–2126A; Gerald Katcher 00–2100A; Bruce Katz 00–2124A; Mel Klein 00–2058A; Patricia Lawrence 00–2050A; Theresa Lyman 00–2138A; Francis Mahoney 00–2116A; Craig Marx 00–2120A; Thomas Marzella 00–2143A; Michael Miller 00–2069A; Madelyne Mozer 00–2054A; Sara Mund 00–2137A; Lisa Perrin 00–2060A; John Pisa 00–2047A; Cyvis Price 00–2113A;

Arnold Restivo 00–2115A; Sandi Rochetti 00–2133A; Kenneth Rosen 00–2067A; Don Rosen 00–2123A; Meyer Sarfati 00–2057A; Cynthia P. Saxman 00–2119A; Joseph C. Schlamowitz 00–2063A; Paul Schmitt 00–2096A; Schulnam Corp., a/k/a Schulman Corp., a/k/a N. Shunam Inc. 00–2145A; Gideon Shacknai 00–2112A; Jerome W. Stein 00–2046A; Douglas Tanney 00–2118A; William Tibbe 00–2104A; Tiedan, Inc. 00–2136A; Norma Turini 00–2056A; Alan Weisman 00–2127A; Myrna Wendlinger 00–2055A and Martin Wyenn 00–2093A.

[2] As described in *Merrill v. Abbott (In re Independent Clearing House Co.)*, 41 B.R. 985, 994 n. 12 (Bankr.D.Utah 1984):

> A "Ponzi" scheme, as that term is generally used, refers to an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments. Typically, investors are promised large returns for their investments. Initial investors are actually paid the promised returns, which attract additional investors.

Thirty of the Broker defendants have filed motions for summary judgment or to dismiss. Reduced to essentials, the movant Brokers assert that the commissions which were paid to them constituted fair, contemporaneous consideration for work and services actually performed in the ordinary course of business, and that there is no basis in fact or law for treating any of such commissions as either preferences or constructive or actual fraudulent conveyances under federal or state law.

For purposes of this decision, the motions for summary judgment are treated as motions to dismiss. All of the Brokers' motions are granted, but only as to the Trustee's fraudulent conveyance claims. The motions are denied without prejudice, and subject to further proceedings, with respect to preference claims and fraudulent conveyance claims for "rollover" commissions. See text under "Further Proceedings" at the end of this opinion.

### Jurisdiction

This Court has subject matter jurisdiction over the adversary proceedings involved in these motions under 28 U.S.C. §§ 157(a) and 1334 and the Standing Order of Referral of Cases to Bankruptcy Judges of the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). These adversary proceedings are "core" proceedings under 28 U.S.C. § 157(b)(2)(A), (F) and (H) in that they are proceedings concerning the administration of the Debtors' estates and to determine, avoid and recover alleged fraudulent conveyances and preferential transfers.

### Background [3]

### The Debtors

There are fifteen Debtors in this administratively consolidated case under Chapter 7.[4] On April 17, 1997 six creditors filed an involuntary Chapter 7 petition against CMIC (97 B 20967[ASH] ), and on June 23, 1997 an order for relief was entered in the CMIC case. On June 23, 27 and July 2, 1997 voluntary Chapter 7 petitions were filed for the remaining fourteen Debtor entities. By order dated July 31, 1997 the fifteen Debtor cases were administratively consolidated under the above caption and case number. Plaintiff was appointed interim trustee and on November 18, 1997 became permanent trustee.

During the Relevant Period, 1991–1997, and at all prior times relevant to these proceedings, the Debtors were operated and controlled principally, if not exclusively, by Gerald P. Hirsch ("Hirsch"). The Debtors and Hirsch held themselves out as offering a full range of financial services under the umbrella of "The Churchill Group" or "Churchill Financial Group." The term "Churchill" was used by Hirsch and the Debtors and is used in the complaints and herein generally to refer to all operations of the Debtors described in the complaints.

---

3. Unless otherwise indicated, the recitation of facts herein is drawn from the complaints, which are all substantially identical, and the Trustee's Memorandum in opposition to the motions.

4. Churchill Mortgage Investment Corporation ("CMIC"), Case No. 97–20967(ASH), Churchill Conservation Services, Inc. ("CCSI"), Case No. 97–21618(ASH), CD Investment Group, Inc. ("CDIG"), Case No. 97–21613(ASH), Churchill Group, Inc. ("Churchill Group"), Case No. 97–21616(ASH), Abbot & Cromwell Corp. ("A & C"), Case No. 97–21617(ASH), Edinberg Services, Ltd. ("Edinberg"), Case No. 97–21614(ASH), Churchill Brokerage Agency ("Churchill Brokerage"), Case No.

97–21673(ASH), Churchill Mortgage Investment Corp. of New Jersey ("CMIC–NJ"), Case No. 97–21708(ASH), Churchill Tax Planning, Inc. ("Churchill Tax"), Case No. 97–21677(ASH), Prim Financial Services, Inc. ("Prim"), Case No. 97–21615(ASH), American Institutional Advisory Services, Inc. ("AIAS"), Case No. 97–21709(ASH), Churchill Residential Mortgage Associates, Inc. ("CRMA"), Case No. 97–21676(ASH), Churchill Lawrence & Addison, Inc. ("CL & A"), Case No. 97–21674(ASH), Hirsch Advisory Services, Inc. ("Hirsch Advisory"), Case No. 97–21710(ASH), Churchill Hemisphere, Inc. ("Churchill Hemisphere"), Case No. 97–21675(ASH).

As described in the complaints, Churchill's operations were carried out principally through the following entities:

(a) CMIC and CMIC–NJ (collectively, "CMIC"). Through CMIC, Churchill made and originated mortgage loans, many of which were sold into the secondary mortgage market; Churchill also assigned mortgages to investors and purported to sell fractional participation interests in mortgages. A majority of CMIC's voting common stock was owned by Hirsch. Ninety percent of CMIC–NJ's voting stock was owned by Edinberg (see below).

(b) CDIG. Through CDIG, Churchill solicited investor funds for investment in its "Certificate of Deposit Investment Group or related investment instruments such as, but not limited to, numismatics, mortgages and government investments, yielding the highest available rate of return." While Churchill maintained handwritten cash receipts and disbursements ledgers for the funds invested in CDIG, the Debtors' books and records do not reflect any financial statements for CDIG, nor any tax returns for any period after 1992. According to Hirsch, CDIG was part of CCSI (see below). According to Debtors' books and records, Hirsch owned 100% of the stock of CDIG.

(c) CCSI. Using the name CCSI, Churchill solicited investments in "Special Accounts" consisting of "investment instruments such as but not limited to, mortgages, government investments, brokered CD's, real estate related products (*i.e.*, CMO's, GNMA, FNMA) and numismatics, yielding the highest available rate of return." Hirsch owned 100% of the stock of CCSI. CCSI also solicited investment in real estate "partnerships."

(d) Edinberg. Churchill issued convertible preferred stock in Edinberg to investors for approximately $1 Million and delivered the proceeds to CMIC ostensibly in exchange for approximately twenty mortgages having a face value of roughly $1 million. Edinberg then reassigned the same mortgages to CMIC in exchange for CMIC "Class C" stock. Hirsch and his family owned 90% of the voting stock in Edinberg.

(e) A & C. Churchill issued "Class B" convertible common stock to A & C investors for approximately $1.5 million. A & C used the proceeds to purchase "Class C" stock in CMIC for $520,000 and made unsecured loans with the balance. Ninety-six percent of the voting stock of A & C was owned by Patricia Lawrence ("Lawrence"), who was nominally the corporation's President. Lawrence lived and continues to live with Hirsch.

(f) Prim. Churchill put three properties in Prim's name.

(g) CL & A. CL & A engaged in no discernable business. The name was ultimately utilized as the corporate name for the Hudson River Gallery, an art gallery operated by Lawrence.

(h) Churchill Brokerage, Churchill Tax, AIAS, CRMA, Hirsch Advisory and Churchill–Hemisphere engaged in no discernable business, and were among numerous corporate shells that were available to be used by Churchill as the need arose for new corporate entities.

### The Ponzi scheme

The alleged Ponzi scheme is described verbatim in all of the complaints as follows:

14. During the relevant period, Churchill conducted its Ponzi Scheme by soliciting investor funds using four principle [sic] investment devices: (1) assignments of and participations in mortgages; (2) pooled funds purportedly invested in high yield money market instruments; (3) stock offerings in a series of debtor entities; and (4) coins.

15. Mortgage Participations

• Using the names CMIC, CMIC–NJ, CCSI and Sensible Mortgage,

Churchill offered and sold what it represented to investors to be participations in mortgages.

● Churchill issued mortgage notes and certificates stating that the investor owned an interest in a mortgage, for a term generally of one or two years, at a specified interest rate, and stating that Churchill guaranteed the monthly payment of principal and interest.

● Some certificates identified specific property which supposedly served as collateral for the mortgage; others referred to a mortgage "warehouse line," with no property specified.

● At the end of each term, Churchill solicited investors to renew their investments for additional periods of time and sent new notes or certificates reflecting the renewal term.

● Churchill represented to investors that the participations were or would be recorded and would constitute liens on the underlying properties; however, in many instances, Churchill did not record such assignments.

● Churchill purported to offer and sell assignments of mortgages it had previously assigned, which were in default or foreclosure, or which did not exist.

● In addition, Churchill frequently sold participations which exceeded the amounts of the underlying mortgages.

● During the relevant period, Churchill sold hundreds, if not thousands, of mortgage participations to investors and, as of December 31, 1996, the outstanding participations on which Churchill had guaranteed payment of principal and interest aggregated approximately $18–20 million.

16. CD Investment Group Fund and CCSI "Special Accounts"

● Using the names CD Investment Group, CD Investment Groups and CCSI, Churchill offered and sold what purported to be investments in its "Certificate of Deposit Investment Group or related investment instruments such as but not limited to, numismatics, mortgages and government investments, yielding the highest available rate of return" and in "Special Accounts" consisting of "investment instruments, such as but limited to mortgages, government investments, brokered CD's, real estate related products (i.e., CMO's, GNMA, FNMA) and numismatics, yielding the highest available rate of return."

● Churchill represented that investments in the CD Investment Group Fund and CCSI "Special Accounts" would be placed in investments that would generate a high return, that such investments were as safe as certificates of deposit and that such investments were insured.

● Investors in the "CD Investment Group Fund" and CCSI "Special Accounts" expressly authorized Hirsch, in writing, to commingle their funds with those of other investors.

● Churchill issued monthly account statements reflecting the purported current value of each account holder's investments and the amount of interest "earned" for the month.

● In fact, the funds entrusted to Churchill by investors in the CD Investment Group Fund and CCSI "Special Accounts" were simply deposited in a checking account and were applied by Churchill to whatever purpose served Churchill's needs of the moment, including loans to borrowers, payoffs and other distributions to holders of participations, Churchill's payroll and generally for the payment of principal and interest due to other investors.

● Churchill represented to some investors that investments in CD Investment Group Fund or CCSI "Special Accounts" would be "tax free"; such investors received lower rates of interest, but the Debtors' books and

records do not reflect any "tax free" investments to support such status.

• During the relevant period, Churchill obtained investments in the CD Investment Group Fund and CCSI "Special Accounts" from hundreds, if not thousands, of investors; as of December 31, 1996, such investments outstanding aggregated approximately $12 million.

17. Stock

• Churchill's books and records reflect continuous negative cash flow. In order to raise cash for payments of principal and interest to investors in mortgage notes and participations and to investors in the CD Investment Group Fund and CCSI "Special Account," Churchill made a series of "private" offerings of stock, using a different entity on each occasion. The proceeds of these offerings were used to repay investors or simply circulated among the various debtor entities.

• Churchill offered and sold A & C "Class B convertible common stock," CMIC "Class B convertible common stock," and Edinberg "Class B convertible preferred stock" for an aggregate of approximately $5 million.

• In addition, as part of a "restructuring plan," Churchill offered more than $2 million in "Class C Preferred Stock" to holders of mortgage participations, representing that such stock would earn a regular annual tax free dividend of 8–1/2%.

18. Coins

• Churchill loaned money to investors who wished to purchase coins, holding the coins as collateral for the numismatic notes receivable it obtained from the investors.

• Churchill obtained funds to make such loans from other investors, who then held numismatic notes payable issued by Churchill; the coins collateralized these obligations as well.

• By the end of the relevant period, Churchill held coins worth approximately $150,000, against which it had issued $540,000 in numismatic notes payable and held $990,000 in numismatic notes receivable.

\* \* \*

19. Throughout the relevant period, Churchill's revenues from "operations" were insufficient to meet its funding requirements. For example, by the end of the relevant period, Churchill's obligations to investors on mortgage participations and "CD Investments" alone aggregated approximately $200,000 per month, while its principal earning assets, mortgage receivables and real estate, generated monthly revenues of less than $70,000.

20. Thus, even without considering the ordinary expenses of operations (which in Churchill's case, included substantial administrative expenses and commissions paid to the sales force which was required to continue producing investors), the cash shortfall guaranteed failure.

21. However, Churchill continued to make payments of interest and dividends to investors, and continued to fund the cash shortfalls of its real estate "partnerships," by generating funds from investors through stock offerings, sales of mortgage participations and investments in CDIG. In addition, in order to control cash flow, Churchill induced investors to reinvest and renew or roll investments over.

22. In sum, throughout the relevant period, Churchill operated as a Ponzi Scheme (the "scheme") and was therefore continuously insolvent and inherently fraudulent, and all of its transfers were actual or constructively fraudulent transfers under the DCL and the Bankruptcy Code.

### The Broker defendants

There are two different categories of Broker defendants in these adversary proceedings, which may be denominated "Mortgage Brokers" and "Investment Brokers."

The role of Mortgage Brokers was typically described in the unrebutted Statement Pursuant to Local Bankruptcy Rule 7056–1 of defendant Bruce Katz.[5] During the Relevant Period CMIC maintained a valid New York State and New Jersey mortgage banking license in good standing. Pursuant to an agreement between Katz and CMIC, Katz operated a Kingston Branch Office for CMIC and performed conventional and traditional mortgage brokerage services utilizing the license of CMIC as a New York State mortgage banker. Katz would solicit all mortgage loan customers, process all applications, submit those applications to traditional lenders and/or wholesalers, obtain commitments and arrange for closings on the loans. On occasion a Churchill entity would fund the loan and become the mortgagee if the mortgagor's credit was insufficient for a traditional lender.[6] CMIC performed little or no services other than to be a conduit for the monies earned in each transaction. The mortgagor would pay a mortgage brokerage fee or commission of between 100 and 150 basis points, which would be split in some agreed proportion between Katz and CMIC. All expenses to operate the Kingston Branch Office were paid by Katz. The commissions which the Trustee seeks to recover from Katz (with minor exceptions not covered by this decision) represented Katz' share of the mortgage brokerage fee or commission paid by the mortgagor and split between CMIC and Katz.

The role of the other defendants, referred to here as Investment Brokers, is described in paragraph 23 of each of the complaints as follows:

23. The Debtors marketed and sold mortgage notes and participations, CDIG and similar investments, corporate stock, numismatic investments and other investments through brokers and other individuals who referred prospective investors to Churchill and solicited existing investors to renew or roll over their existing investments with Churchill.

It appears from the parties' written and oral submissions that mortgage broker and investment broker services were performed by some persons characterized as employees of Churchill, and by other persons characterized not as employees but as independent contractors. The distinction drawn by the Trustee appears to be that compensation paid to employees was reported for tax purposes on a Form W–2, whereas commission compensation paid to independent contractors was reported on a Form 1099. However, some employees were paid commissions reported on W–2 Forms, and some who received compensation reported on a Form W–2 also received commission payments reported on a Form 1099.

In these adversary proceedings the Trustee has sought to recover only commission payments reported on a Form 1099 and has not sought any recovery against any Churchill employee who received broker commissions reported on Form W–2.

### The Trustee's claims

Under Fed.R.Civ.P. 12(b)(6), which is made applicable to this proceeding by Fed.R.Bankr.P. 7012(b), a defendant may move to dismiss a complaint on the ground that it fails to state a claim upon which relief can be granted. In deciding a motion under Rule 12(b)(6), the court must presume all factual allegations of the com-

---

**5.** Unrebutted facts set forth in a Rule 7056–1 Statement are deemed to be true. *In re Minpeco, USA, Inc.,* 237 B.R. 12, 16 (Bankr. S.D.N.Y.1997).

**6.** See *In re Churchill Mortgage Inv. Corp.,* 233 B.R. 61 (Bankr.S.D.N.Y.1999).

plaint to be true and make all reasonable inferences in favor of the non-moving party. *In re Demas,* 150 B.R. 323, 326–27 (Bankr.S.D.N.Y.1993) (citations omitted); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989).

In reviewing a motion to dismiss, a court merely assesses the legal feasibility of the complaint, and does not weigh the evidence that may be offered at trial. *Global Entertainment, Inc. v. New York Telephone Co.,* 2000 WL 1672327, at *2 (S.D.N.Y. Nov. 6, 2000) (citing *Festa v. Local 3, Int'l Brotherhood of Elec. Workers,* 905 F.2d 35, 37 (2d Cir.1990)). In determining the sufficiency of the complaint, courts must accept as true the factual allegations contained in the complaint. *Id.* This is not to say, however, that every statement in a complaint must be accepted as true. "The allegations of a complaint must be 'well pleaded' and thus the court need not accept 'sweeping and unwarranted averments of fact.' " *Perniciaro v. Natale (In re Natale),* 136 B.R. 344, 348 (Bankr. E.D.N.Y.1992) (quoting *Haynesworth v. Miller,* 820 F.2d 1245, 1254 (D.C.Cir. 1987)). When determining the sufficiency of the complaint for Rule 12(b)(6) purposes, the court's consideration is limited to the factual allegations in the complaint, to documents attached to the complaint as exhibits, or incorporated in it by reference, to matters of which judicial notice may be taken or to documents on which plaintiff relied in bringing suit. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993).

It is essential in resolving a motion to dismiss to focus precisely on the claim or claims which are being asserted in a complaint. Where a complaint is vague, lacking in specifics, or ambiguous, one of the tasks of the court on a motion to dismiss is to ascertain from counsel what factual claims the plaintiff is and is not intending to make in order to determine what is, and is not, intended to be put in issue by the challenged complaint. Only by doing so can the court assess the legal sufficiency of the claim actually being asserted.

The complaints in all of the Broker adversary proceedings contain only two paragraphs alleging conduct by the Broker defendants (aside from receipt of commissions), paragraphs 23 and 24.

23. The Debtors marketed and sold mortgage notes and participations, CDIG and similar investments, corporate stock, numismatic investments and other investments through brokers and other individuals who referred prospective investors to Churchill and solicited existing investors to renew or roll over their existing investments with Churchill.

24. Defendant acted as a broker, or otherwise introduced or solicited investors as described in paragraph 23 above, or procured borrowers for mortgage loans made by or through one or more of the Debtors, and in return therefor, during the relevant period, received payments from the Debtors in the amounts set forth below ("Commission Payments"). As a matter of law, Defendant gave the Debtors no value or fair consideration in exchange for the Commission Payments which Defendant received.

It is important here to note what the Trustee does *not* allege. There is no allegation in the complaints and no claim by the Trustee that the Brokers had any knowledge of the Ponzi scheme.[7] There is

---

7. At the hearing on the motions the Trustee's counsel responded as follows to the Court's questions:

THE COURT: All right. And one other question. Is it not also true that you do not allege that any of the mortgage originator defendants who have moved here had any actual knowledge of or otherwise in some way participated in the Ponzi scheme? Let

me break that up because it's really two questions.

MR. ZELERMYER: Right.

THE COURT: Had actual knowledge. There's no allegation that any of them had actual knowledge.

MR. ZELERMYER: That's correct.

(Tr. 42–43)

no allegation in the complaints and no claim by the Trustee that any of the Brokers' activities were fraudulent, or unlawful, or wrongful in any manner.[8]

The complaints do contain conclusory allegations that "the Debtors received less than reasonably equivalent value [or fair consideration] in exchange for such Commission Payments" (e.g., Katz complaint paragraphs 38, 47, 72, 81). But it is clear from counsel's acknowledgments at the hearing that the Trustee does not assert or intend to prove at a trial that the commissions paid to the Brokers did not constitute fair or reasonably equivalent value for the Brokers' services in the sense that the commissions were disproportionate to commissions that would normally be paid for such services in the marketplace. The Trustee's position as alleged in the complaints and amplified by the Trustee's counsel in court papers and at the hearing is that all such commissions, although reasonably equivalent in value to the services provided in a marketplace sense, were constructively fraudulent simply because the commissions were paid by an entity engaged in a Ponzi scheme.[9] See section III A, below.

### The Issue

It is assumed for purposes of these motions that, as alleged in the complaints, the Churchill enterprise as a whole was operated as a Ponzi scheme, that the Debtors individually or collectively were insolvent during the relevant period, that the income and investments generated for the Debtors by the Brokers clothed the Debtors with an aura of respectability, and that the funds generated and aura of respectability created by all the defendants' activities assisted in enabling the Debtors' corrupt management to continue the Ponzi scheme until Churchill's inevitable collapse in early 1997.

It is also assumed that the Brokers had no knowledge of the Ponzi scheme, and that the Brokers' own activities were not unlawful or wrongful in any respect. Most important in the context of fraudulent conveyance law, it is assumed here that the commissions were equivalent in value to the services rendered in the specific bro-

---

THE COURT: And in no case is there any allegation that any of these defendants had any actual knowledge that a Ponzi scheme, a fraud, was ongoing?

MR. ZELERMYER: As in Randy, as in Rodriguez and as in Blazo, that's correct. (Id. at 50)

THE COURT: ... Is it your thought that discovery or evidence at trial might demonstrate that they [the Brokers] did in fact have some actual knowledge or are chargeable in some way with some actual knowledge of the fact that it was a Ponzi scheme?

MR. ZELERMYER: It's possible but it's not an argument that we've made.

THE COURT: Okay. You do not rely on that?

MR. ZELERMYER: Does not depend on it.

THE COURT: Okay. So, you don't allege it and you don't anticipate alleging—

MR. ZELERMYER: That's correct.

THE COURT: —factual knowledge on the part of any of these people?

MR. ZELERMYER: That's correct. It is our position that that's irrelevant. It is the position of the case law that we rely on that that's irrelevant.

8. THE COURT: They [the Brokers] made a contribution but it was strictly a positive contribution. It's hard to articulate anything negative that they did. What did they do that was wrong?

MR. ZELERMYER: Viewed in isolation, if you can isolate their activities, I [inaudible] [it is the Court's recollection that Mr. Zelermyer acknowledged that no wrongdoing by the Brokers is alleged]. What they're doing wrong is not what's important here....

THE COURT: The theory here, it seems to be sort of a theory of strict liability for having done nothing wrong.

MR. ZELERMYER: That's correct. We don't allege that any of them did anything wrong. We do not allege that they did anything wrong, but that's irrelevant. They're not being asked to give money back because they did something wrong, just as a preferential creditor doesn't necessarily do anything wrong.

(Transcript 45-46)

9. See Transcript 50-54.

ker transactions in which the commissions were paid. The Trustee acknowledges that the commissions would not be subject to avoidance as actively or constructively fraudulent but for the fact that they were paid by entities engaged in a Ponzi scheme.

Upon these premises, the only issue for decision on these motions to dismiss is whether commissions, not otherwise subject to avoidance under Sections 544 and 548 of the Bankruptcy Code and Sections 271–276 of the D & CL, are rendered constructively fraudulent solely by reason of the fact that they were paid by entities engaged in a Ponzi scheme. May the Brokers be held liable to repay commissions, which they earned in good faith and in fair exchange for services actually rendered, merely because the Debtors' management was independently engaged in a fraudulent enterprise? Stated differently, may the Brokers' services, as a matter of law, be deemed of no value to the Debtors because the Debtors' operation as a Ponzi scheme was facilitated or prolonged by the funds received by the Debtors through those services?

### Discussion

### I. *The governing legal authorities*

■ D & CL §§ 271–276 (incorporated by Section 544(b)(1) of the Bankruptcy Code), and Section 548 authorize the trustee to avoid transactions which have the purpose or effect of removing property from a debtor's estate which should properly be used to repay creditors. Section 548 and the D & CL each contain provisions applying to two categories of transfers: (1) those made with "actual intent to hinder, delay, or defraud," and (2) those which, regardless of the debtor's intent, are constructively fraudulent because the debtor did not receive "reasonably equivalent value" or "fair consideration" in exchange for property transferred while insolvent.

### A. *Transfers made with actual intent to hinder, delay or defraud creditors*

The portion of Section 548 which pertains to actual fraud states:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation *with actual intent to hinder, delay, or defraud* any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted [.]

(emphasis supplied).

Similarly, under D & CL § 276:

Every conveyance made and every obligation incurred *with actual intent,* as distinguished from intent presumed in law, *to hinder, delay, or defraud* either present or future creditors, is fraudulent as to both present and future creditors.

(emphasis supplied).

It has been held that a debtor running a Ponzi scheme possesses actual intent to hinder, delay or defraud. *Martino v. Edison Worldwide Capital (In re Randy),* 189 B.R. 425, 438 (Bankr.N.D.Ill.1995). The reason for such a result is explained in *In re Independent Clearing House,* 77 B.R. 843, 860 (D.Utah 1987):

A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substan-

tial certainty constitutes intent in the eyes of the law ... and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. (citation omitted).

However, the trustee cannot recover property conveyed to a transferee for value who acted in good faith. Section 548(c) provides:

(c) Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, *a transferee* or obligee of such a transfer or obligation *that takes for value and in good faith* has a lien on or *may retain any interest transferred* or may enforce any obligation incurred, as the case may be, *to the extent that such transferee* or obligee *gave value to the debtor in exchange for such transfer* or obligation.

(emphasis supplied). The parallel state-law provision is found in D & CL § 278:

1. Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person *except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase,* or one who has derived title immediately or mediately from such a purchaser.

a. Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim....

(emphasis supplied).

■ Thus, even a trustee who is able to show that a debtor made a transfer with the intent to defraud, hinder or delay will be unable to recover against a transferee who takes for "value and in good faith" under the Bankruptcy Code, or for "fair consideration and without knowledge" under the Debtor & Creditor Law. *Hirsch v. Cahill (In re Colonial Realty Co.),* 210 B.R. 921 (Bankr.D.Conn.1997); *see also In re Armstrong,* 231 B.R. 739 (Bankr. E.D.Ark.1999) (trustee could not recover

money from transferee that gave value and acted in good faith from debtor acting with actual intent to defraud); *Struve v. Khan (In re Mesa),* 48 B.R. 208 (Bankr.S.D.Fla. 1985) ("It is well established that the transferee obtains protection to the extent of the consideration given by him if he can demonstrate his innocence of any intent to participate in the fraud perpetrated on the transferor's creditors") (citing 4 L. King, COLLIER ON BANKRUPTCY ¶ 548.07[3] (15th ed.1983)).

### B. *Constructively fraudulent transfers*

If actual intent to defraud creditors cannot be proved under Section 548(a)(1)(A), a transfer may be avoided under a theory of constructive fraud. Section 548(a)(1)(B) states:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

\* \* \*

(B) (i) *received less than a reasonably equivalent value* in exchange for such transfer or obligation; *and*

(ii) (I) *was insolvent* on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

The parallel provisions are found in four sections of the D & CL:

**§ 272. Fair Consideration**

Fair consideration is given for property, or obligation,

a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

**§ 273. Conveyances by insolvent**

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered *insolvent* is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred *without a fair consideration.*

**§ 274. Conveyances by persons in business**

Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

**§ 275. Conveyances by a person about to incur debts**

Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

Although the terminology used by the D & CL differs from that used in the Bankruptcy Code, both ultimately require a trustee to establish[10] that the debtor did not receive "reasonably equivalent value" or "fair consideration" in the transaction.

█ The three terms—"reasonably equivalent value" in Section 548(a)(1)(b), "fair consideration" in the D & CL and "value" in Section 548(c)—have the same fundamental meaning. Because the D & CL parallels Section 548, the two statutes are interpreted similarly by the courts. *HBE Leasing Corp. v. Frank,* 48 F.3d 623, 638 (2d Cir.1995); *SIPC v. Ensminger (In re Adler, Coleman Clearing Corp.),* 247 B.R. 51, 116 (Bankr.S.D.N.Y.1999); *European American Bank v. Sackman Mortgage Corp. (In re Sackman Mortgage Corp.),* 158 B.R. 926, 938 (Bankr.S.D.N.Y. 1993); *Scherling v. Pan Trading Corp., S.A. (In re Chadborne Industries, Ltd.),* 71 B.R. 86, 89 (Bankr.S.D.N.Y.1987); *Murdock v. Plymouth Enterprises, Inc. (In re Curtina Int'l, Inc.),* 23 B.R. 969, 974 (Bankr.S.D.N.Y.1982); *Pereira v. Checkmate Communications Co. (In re Checkmate Stereo & Electronics),* 9 B.R. 585, 591 (Bankr.E.D.N.Y.1981), *aff'd,* 21 B.R. 402 (E.D.N.Y.1982); *Breeden v. Bennett (In re The Bennett Funding Group, Inc.),* 220 B.R. 743, 754 (Bankr.N.D.N.Y.1997).

**C. The key question: how to determine "reasonably equivalent value"**

The key to deciding the issue before the Court is a clear articulation of the method to be applied in order to determine whether sufficient "value," "reasonably equivalent value" or "fair consideration" (hereafter "value," as in "value defense") was given and received in the transactions between the Debtors and Brokers.

The method for determining value is prescribed by the statutes. Section 548(a)(B)(i) defines the test as whether the

**10.** This is not an expression of view as to burden of pleading or proof, which is not at issue here.

debtor "received less than a reasonably equivalent value in exchange *for such transfer.*" Section 548(c) states the test to be whether the "transferee or obligee gave value to the debtor in exchange *for such transfer.*" D & CL § 272 states the test as whether there is an exchange of property, obligation or antecedent debt that is "a fair equivalent *therefor*" or "not disproportionately small *as compared with the value of the property, or obligation obtained.*"

■ The statutes are quite clear. The focus of the inquiry in both is the specific transaction the trustee seeks to avoid, *i.e.,* the *quid pro quo* exchange between the debtor and transferee, rather than an analysis of the transaction's overall value to a debtor as it relates to the welfare of the debtor's business. *See* 5 L. King, COLLIER ON BANKRUPTCY ¶ 548.05[1][b] at 548–35 (15th Ed.1998) ("In order to determine if a fair economic exchange has occurred in a case of a suspected fraudulent transfer, the bankruptcy court must analyze all the circumstances surrounding *the transfer in question*") (emphasis supplied).

■ Value is present if the debtor receives a fair equivalent in exchange for its property or obligation. *HBE Leasing Corp.,* 48 F.3d at 638. Defined quantitatively, the debtor should receive "a fair equivalent" or an "amount not disproportionately small as compared with the value of the property or obligation" the debtor has given up. *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979, 993 (2d Cir.1981); *In re 375 Park Avenue Associates, Inc.,* 182 B.R. 690, 695–96 (Bankr. S.D.N.Y.1995).

The *Rubin* court explained the logic behind the requirement: if the debtor receives property or discharges or secures an antecedent debt that is substantially equivalent in value to the property given or obligation incurred by him in exchange, then the transaction has not significantly affected his estate and his creditors have no cause to complain. By the same token, however, if the benefit of the transaction to the debtor does not substantially offset its cost to him, then his creditors have suffered....

661 F.2d at 991. While *Rubin* held that neither "mathematical precision" nor a "penny-for-penny exchange" is required, "the court must keep the equitable purposes of the statute firmly in mind, recognizing that any significant disparity ... will have significantly harmed the innocent creditors...." *Id.* at 994.

■ "The implementation of this approach requires case-by-case adjudication. In determining whether property was sold for reasonably equivalent value, the bankruptcy court must, of course, be mindful constantly of the purpose of section 548's avoiding powers—to preserve the assets of the estate." *Bundles v. Baker (In re Bundles),* 856 F.2d 815, 825 (7th Cir.1988). "The inquiry ... will require the bankruptcy court to draw upon its expertise in evaluating the economic forces at play in a specific case." *Id.* at 825. *See also Adwar v. Capgro Leasing Corp. (In re Adwar),* 55 B.R. 111, 114–15 (Bankr.E.D.N.Y.1985) (rejecting the use of formulaic presumptions to determine reasonably equivalent value, and citing *In re Rubin*); *Cooper v. Ashley Communications, Inc. (In re Morris Communications NC, Inc.),* 914 F.2d 458, 466–67 (4th Cir.1990) (same).

■ This standard has been described as a "measurement test." *Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.),* 124 B.R. 984, 997 (Bankr. S.D.Ohio 1990). "The determination of whether reasonably equivalent value was received by the debtor requires the court to compare what was given with what was received." *Coan v. Fleet Credit Card Services (In re Guerrera),* 225 B.R. 32, 36 (Bankr.D.Conn.1998). The Seventh Circuit stated:

We have held that the formula for determining reasonably equivalent value is not a fixed mathematical formula; rather, the standard for "[r]easonable equiv-

alence should depend on all the facts of each case," an important element of which is fair market value. Another important factor in assessing reasonably equivalent value is whether the sale was "an arm's length transaction between a willing buyer and a willing seller."

*Barber v. Golden Seed Co., Inc.*, 129 F.3d 382, 387 (7th Cir.1997) (quoting *In re Bundles*, 856 F.2d at 824). *See also Join–In Int'l (U.S.A.) Ltd. v. New York Wholesale Distrib. Corp. (In re Join–In Int'l (U.S.A.) Ltd.)*, 56 B.R. 555, 560 (Bankr.S.D.N.Y. 1986) ("The court must consider *all* the factors of the transaction. . . .") (emphasis in original); 5 L. King, COLLIER ON BANKRUPTCY ¶ 548.05[1][b] at 548–35 (15th Ed.1998).

From the foregoing, it is evident that the analysis which must be used to determine value is a commercial equation which looks to the actual transaction between the debtor and the transferee, and the Court must measure "what was given and received" *in that transaction.*

## II. *The governing law as applied to the fraudulent conveyance claims alleged by the Trustee*

 Assuming (without deciding) that the complaints adequately allege all of the other factual elements required under the Bankruptcy Code and the D & CL to invoke the remedy of avoidance for active or constructive fraudulent conveyance, the Trustee must fail on one essential element, which we have referred to above as "value" or the "value defense" under Bankruptcy Code §§ 548(a)(1)(B) and 548(c) and D & CL §§ 272–275 and 278.

The complaints do allege in conclusory language in paragraph 22 that "all of [the Debtors'] transfers were actual or constructively fraudulent transfers under the DCL and the Bankruptcy Code" (*see* point III A, below). But in fact the Trustee is not asserting that the *commissions* were not reasonably equivalent in value to the *services* rendered by the Brokers. The Trustee acknowledged at the hearing that her claims against the Brokers are not based upon any evidence that the commissions which were paid to the Brokers for their services were disproportionate to like commissions paid for like services in the marketplace during the Relevant Period by similar but legitimate business entities.

The correct fraudulent conveyance analysis is well illustrated in a 1986 District Court decision involving facts materially indistinguishable from these cases, *Merrill v. Allen (In re Universal Clearing House Company)*, 60 B.R. 985 (D.Utah 1986). *Universal Clearing House* involved a Ponzi scheme in which the investors in a group of related debtor entities (the clearinghouse companies) were referred to as "undertakers." Merrill, as trustee of one of the clearinghouse companies, brought an adversary proceeding to recover funds that the debtors had paid to approximately 127 sales agents as commission payments for inducing undertakers to invest with the clearinghouses. 60 B.R. at 989. The Bankruptcy Court "held as a matter of law that because the [brokers'] services deepened the debtors' insolvency and furthered a fraudulent scheme, the services were 'without legally cognizable value.' " 60 B.R. at 998. The District Court reversed.

In concluding that the brokers' services constituted "value" in consideration for the commissions under Section 548(c), the District Court in *Universal Clearing House* said:

> Under the present Bankruptcy Code, satisfaction of a present or antecedent debt constitutes value. See 11 U.S.C. § 548(d)(2)(A). In these cases, the debtors contracted with appellants for the sale of undertaker contracts. Pursuant to their contracts, appellants performed services thereby giving consideration to the debtors under the terms of their contracts. Accordingly, the debtors incurred the obligation to pay appellants for their services. That obligation constituted a debt that was satisfied by the payment of commissions pursuant to the

contracts. The satisfaction of the debts to appellants falls squarely within the definition of value found in 11 U.S.C. § 548(d)(2)(A). [60 B.R. at 998–99.]

\* \* \*

We conclude that a determination of whether value was given under section 548 should focus on the value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise. We therefore hold that, as a matter of law, the services provided by appellants did constitute value as that term is used in section 548. [60 B.R. at 1000]

Like the brokers in *Universal Clearing House*, the Brokers in these cases were hired and paid to produce mortgages or investors. They produced and thereby gave value, giving rise to a contractual obligation on the part of Churchill to pay the commissions here at issue. They earned what they were paid fairly and without wrongdoing. On this ground the Trustee's fraudulent conveyance claims to recover commissions from the Brokers must be dismissed as a matter of law.

### III. The basic defect in the Trustee's fraudulent conveyance theory

#### A. The Trustee's theory

The Trustee's claim relies on a legal theory that conflicts with the facts and has no basis in the Bankruptcy Code or the D & CL. The theory, as expressed in paragraph 22 of the complaints, is that "Churchill operated as a Ponzi Scheme ... and was therefore ... inherently fraudulent, and all of its transfers were actual or constructively fraudulent transfers under the DCL and the Bankruptcy Code." As amplified in the Trustee's Memorandum (p. 25), "where services rendered to the Debtors operating a Ponzi scheme have the effect of perpetuating the Ponzi scheme, no value is conferred as a matter of law since such services only 'exacerbat[ed] the harm to creditors by increasing the amount of claims while diminishing the debtor's estate.'" The conceptual heart of the theory lies in the postulate that "no value is conferred as a matter of law, since such services only exacerbated the harm to creditors by increasing the amount of claims while diminishing the debtor's estate."

The fatal legal flaw [11] in this postulate, as a matter of fraudulent conveyance analysis, is that it focuses not on a comparison of the values of the mutual consideration actually exchanged in the transaction between the Broker and the Debtor, but on the value, or more accurately stated, the supposed significance or consequence of the Broker–Debtor transaction in the context of the Debtors' whole Ponzi scheme. But as shown under point I C, above, the statutes and case law do not call for the court to assess the impact of an alleged fraudulent transfer in a debtor's overall business. The statutes require an evaluation of the specific consideration exchanged by the debtor and the transferee in the specific transaction which the trustee seeks to avoid, and if the transfer is equivalent in value, it is not subject to avoidance under the law.

11. Although not necessary to the legal analysis which is determinative of the motions before the Court, the postulate is also factually wrong on the very facts alleged in the complaints. As to Mortgage Broker transactions, there is no dispute that every such transaction generated net revenue for the Debtors; indeed, the Trustee has asserted that Mortgage Broker fees were "a substantial portion of Churchill's actual revenues" (Trustee's Memorandum at 2). The Mortgage Broker services neither increased the amount of claims against nor diminished the assets of the Debtors' estate. As to Investment Broker services, it is true that success in finding investors increased the amount of claims against the Debtors to the extent of the funds brought in. But nothing the Investment Brokers did diminished the Debtors' assets. As in any Ponzi scheme, the Debtors' assets were dissipated not by the Brokers' services but because the Debtors' management used new investments to pay principal and interest on old investments, rather than investing the new money in assets capable of generating *bona fide* investment returns.

Not every transaction which has the effect of "exacerbating the harm to creditors by increasing the amount of claims while diminishing the debtor's estate" is a fraudulent conveyance. Section 548 is not a catch-all provision. It allows the trustee to avoid only the transfers prescribed by the statute. Often, a debtor prior to bankruptcy will make improvident purchases or expenditures which have a detrimental effect on creditors and may even be the precipitating cause of bankruptcy. A spendthrift debtor may purchase clothes or a new car, take costly vacations on credit, or otherwise incur unpayable debts for goods or services. The fact that all these transactions may be said to "exacerbate the harm to creditors and diminish the debtor's estate" from an overall perspective does not mean that the debtor received less than reasonably equivalent value in respect of each particular transaction.

The Trustee's theory ignores the actual transaction between Debtor and Broker and the undisputed equivalence in value between the commissions and the Broker's services, and instead focuses on collateral conduct of the Debtors' management (the overall operation of the Ponzi scheme), which is extraneous to any particular transaction between Debtor and Broker. To say that either a Mortgage Broker transaction or an Investment Broker transaction conferred no value on the Debtors is fiction insofar as the particular transaction itself is concerned. Fraudulent conveyance law, under both state and federal statutes, is concerned with the reality of whether the transferee conferred equivalent value on the debtor *in the*

*transaction sought to be avoided.* The fact that the debtor's enterprise as a totality is operated at a loss, or in a manner that is fraudulent, does not render actually or constructively fraudulent a particular transaction which in and of itself is not fraudulent in any respect.[12]

The District Court decision in *Universal Clearing House* cogently rebuts the Trustee's position here:

The bankruptcy court reasoned that appellants gave no value because the services that they performed were actually detrimental in that each contract they sold increased the debtors' insolvency. The fact that the services appellants performed increased the debtors' insolvency does not preclude a determination that the appellants gave value. By definition, a Ponzi scheme is driven further into insolvency with each transaction. Therefore, by the trustee's reasoning, no one who in any way dealt with, worked for, or provided services to the debtors could prevent avoidance of any transfers they received. The debtors' landlord, salaried employees, accountants and attorneys, and utility companies that provided services to the debtors all assisted the debtors in the furtherance of their fraudulent scheme. In spite of this fact, we do not think that the goods and services that these persons and entities provided were without value or that transfers to them could be set aside as fraudulent conveyances. We see no material distinction between such persons or entities and appellants. All were necessary to the success of the debtors' scheme.

---

12. In addition to the legal and factual defects in the Trustee's central postulate, discussed above in the text and in footnote 11, there is a telling anomaly or incongruity in the Trustee's case which should not go unremarked. While the Trustee would deny the "value defense" to the Broker defendants because they were "independent contractors," the Trustee "believe[s] that regular salaried employees, just as some ordinary trade creditors ... do have the value defense" (Transcript 54). But no legitimate ground exists to distinguish between an employee (tax reported on Form W-2) and an independent contractor (tax reported on Form 1099). Both received compensation (whether you call it commissions or salary) for lawful services contractually rendered to the Debtors which enabled the Churchill group to continue the Ponzi scheme. Why should independent contractors be any less entitled to the "value defense" than employees?

The financial position of a debtor need not necessarily be improved by a particular transaction in order for us to hold that value was given.

60 B.R. at 999, footnotes omitted.

■ Fraudulent conveyance law is grounded in equity and is designed to enable a trustee or creditors to avoid a transfer in a transaction where the transferee received more from the debtor than the debtor received from the transferee. The remedy of avoidance seeks to rectify the disparity between that which the transferee gave and that which the transferee got in the transaction. It is this disparity that makes it equitable to require the transferee to repay the excess in value of what he received over what he gave up in the transaction.

In this case there was no disparity between the commissions and the value of the Brokers' services. Equity, and the law, would be ill-served by granting relief on these complaints.

## B. *The cases relied on by the Trustee*

The Trustee relies on five decisions to support her fraudulent conveyance theory. Four of them are inapposite because they concerned distributions to investors on account of their investments in Ponzi schemes, rather than payments of commissions to brokers in satisfaction of contractual liability for services rendered. Only one case, *In re Randy,* supports the Trustee, in a decision which this Court believes to be unsound.

*Merrill v. Abbott (In re Independent Clearing House Company),* 77 B.R. 843 (D.Utah 1987) was a companion case to *In re Universal Clearing House, supra,* involving the same clearinghouse debtors victimized in the same Ponzi scheme.[13] The decision in *Independent Clearing House* contains lucid analysis on a number of issues of federal and state fraudulent

conveyance and preference law, none of which is germane to the narrow issue raised by the Trustee's legal theory in this case. Suffice it to say that *Independent Clearing House* stands for the universally-accepted rule that investors may retain distributions from an entity engaged in a Ponzi scheme to the extent of their investments, while distributions exceeding their investments constitute fraudulent conveyances which may be recovered by the Trustee.

*Dicello v. Jenkins (In re International Loan Network, Inc.),* 160 B.R. 1 (Bankr. D.D.C.1993), like *Independent Clearing House,* involved claims by a Chapter 7 trustee against investors to recover prepetition distributions to investors. The Bankruptcy Court in *International Loan Network* adhered to the general rule that distributions of "profits" to investors in excess of their investment constitute fraudulent conveyances subject to avoidance. The investor-defendants argued that such distributions should be deemed to be in exchange for services which they had rendered in recruiting, training and supervising new investors. Assuming "that such services were in fact provided," the Bankruptcy Court went on to state the issue as follows (160 B.R. at 14):

However, the fact that such services were provided does not resolve the real issue—whether [the debtor] was indebted to the defendants for these services on either a contractual or restitutionary basis. In other words, the court must determine whether these defendants have a claim against [the debtor] for the services provided.

The Bankruptcy Court concluded that the debtor had no contractual or other obligation to the investors in respect of the recruiting services and, therefore, that those services did not constitute "value" under the Bankruptcy Code or state law. The Court held: "there was no enforceable

13. *In re Universal Clearing House* was decided by District Judge Winder, while *In re Independent Clearing House* was decided by District Judges Jenkins, Winder and Greene sitting en banc.

contract between [the debtor] and the defendants for the services they performed" (*id.*); "No Debt for the Services Existed on Restitutionary Grounds" (*id.*); "no contract existed obligating [the debtor] to pay the defendants for their services" (*id.* at 15). Based on these findings, this Court agrees with the foregoing analysis and result in *International Loan Network.*

The basic factual distinction between the gratuitous "services" provided by investors in *International Loan Network* and the traditional broker services contractually rendered by the Brokers in this case in exchange for commissions was expressly acknowledged by the Court in *International Loan Network:*

> These defendants were not like secretaries, lawyers and other employees or independent contractors: such workers did not invest money in the debtor's pyramid scheme before they were entitled to compensation. Such workers looked solely to their services performed as the basis for their compensation.[14]

The two unreported decisions in *Wilson v. RHS & Associates (In re Blazo Corporation)*, 1994 WL 92405 (Bankr.N.D.Ohio February 1994) and 1994 WL 456881 (Bankr.N.D.Ohio July 1994) also involved defendants who were investors in a Ponzi scheme and had received distributions from the operator, Blazo, which exceeded their investments by some $276,000. The Chapter 7 Trustee sought to recover the $276,000 under the familiar rule that distributions to an investor exceeding the amount of his investment constitute fraudulent conveyances. As in *International Loan Network*, the defendants argued that they had rendered uncompensated services (sales efforts) on behalf of the debtor which should be deemed "value" given by the defendants in exchange for the distributions. The Bankruptcy Court summari-

ly rejected this contention. Relying on the Court's own unreported decision in another case, without any analysis of the facts or fraudulent conveyance law, the Court concluded:

> The defendants worked, by their own admission, assiduously and effectively to advance the debtor's nefarious scheme. Their efforts do not deserve to be rewarded.

Neither *International Loan Network* nor *Blazo* supports the Trustee's theory in the Churchill adversary proceedings. Both cases involved claims against investors to recover distributions which exceeded the investors' undertakings under the well-established rule. The courts in both cases rejected the investors' bogus value defense based upon recruiting services because, as expressly found in the *International Loan Network* case, the debtor did not contract with the investors to perform broker services, had no obligation to pay for such services and, consequently, received no legally cognizable value from the investors.

*Floyd v. Dunson (In re Rodriguez)*, 209 B.R. 424 (Bankr.S.D.Tex.1997), is another case where the defendant was an investor in a Ponzi scheme. In addition to the investment contracts which he purchased, "the defendant had a verbal agreement with Ms. Rodriguez concerning the payment of commissions for investments made by other investors." 209 B.R. at 429. However, the Court expressly found that "[t]he defendant never actively solicited any individuals to invest with debtors." *Id.* Hence, there was no basis to find that the distributions to the investor-defendant were anything other than phantom "profits" recoverable as fraudulent conveyances under the general rule.

**14.** To the extent that the Bankruptcy Court in *International Loan Network* questioned the continued viability of the analysis and holding in *Universal Clearing House* (*see* footnote 19 at 160 B.R. at 14) and expressed hypothetically and in dicta views that may be construed to support the Trustee's theory in this case (*see* the sentence beginning "Similarly here ..." under the heading "Even if a Contract Existed Here, the Services Conferred no Value" at 160 B.R. at 16), this Court disagrees.

The Trustee cites only one case involving facts substantially indistinguishable from the facts before this Court, *Martino v. Edison Worldwide Capital (In re Randy)*, 189 B.R. 425 (Bankr.N.D.Ill.1995). In the *Randy* case, the defendants were brokers hired by the debtor, Randy, to solicit investors in Randy's Ponzi scheme. The Chapter 7 Trustee sued several brokers to recover commissions paid to them by Randy for their broker services. Citing *Independent Clearing House, International Loan Network* and *Blazo* (all of which involved claims to recover profits paid to investors in Ponzi schemes), the Court in *Randy* granted judgments against the broker-defendants, relying on the dicta in *International Loan Network*, referred to in footnote 14, above, and reasoning that " 'even if a contract existed here, the services conferred no value' and, in fact, enforcing a contract for selling efforts in a Ponzi scheme would only 'exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate.' " 189 B.R. at 441.

This Court declines to follow the decision in *Randy*, for the reasons set forth at length in section III A of this decision and in *In re Universal Clearing House.*

### Further Proceedings

In its Joinder in opposition to the instant motions, the Official Committee of Unsecured Creditors asserts in paragraph 3: "Currently, the Committee is amassing evidence from creditors who dealt with brokers which would prove the brokers' knowledge of the Ponzi Scheme and misrepresentations to creditors." This decision is concerned only with the complaints as presently framed, which do not allege Broker knowledge of the Ponzi scheme or misrepresentations to creditors. Nothing in this decision shall prejudice the right of the Committee or the Trustee or any party in interest to file a complaint against any other party based upon misrepresentation or knowledge of or participation in the alleged Ponzi scheme.

Nor shall this decision prejudice the Trustee's right to assert fraudulent conveyance claims based upon evidence showing that commissions were paid (for example, to insiders) that exceeded the value of broker services. This opinion is addressed to the legal theory relied upon by the Trustee in these adversary proceedings, as described in section III A. Hence, the premise here is that the commissions were fair recompense for the services in the relevant marketplace and time.

It appears from oral and written submissions of the parties that some small portion of the commissions sought to be recovered by the Trustee as fraudulent conveyances may have been paid to Investment Brokers in respect of "rollover" investments. The record before the Court does not reveal what, if any, services were rendered by the Brokers in respect of rollover commissions. Accordingly, this decision does not apply to any claims in respect of rollover commissions.

Neither the complaints nor the submissions of the parties provide the Court with sufficient information as to the Trustee's claims in respect of alleged preferences under Section 547 of the Bankruptcy Code to enable the Court to rule either on the motions for summary judgment or the motions to dismiss.

The Court will schedule a conference at an early date after issuance of this decision to consider further proceedings to expedite the resolution of fraudulent conveyance claims for rollover commissions and preference claims.

### Conclusion

In the interest of economy, the Court will ask counsel for the Trustee to prepare and circulate to counsel for the moving defendants a proposed order consistent with this decision dismissing the Trustee's fraudulent conveyance claims with respect to commissions and denying the motions

without prejudice with respect to rollover commissions and preferences.