Barbara **BALABER–STRAUSS,** as Trustee of Churchill Mortgage Investment Corp., Plaintiff–Appellant,

v.

Pat **LAWRENCE.**

Nos. 01 Civ. 3752(CLB) to 01 Civ. 3786(CLB).

United States District Court, S.D. New York.

July 9, 2001.

Benjamin Zelermyer, Serchuk & Zelermyer, LLP, White Plains, NY, for Barbara Balaber Strauss, trustee.

Joseph Gelb, CPA, Woodmere, NY, for appellee Pat Lawrence.

Myrna Wendlinger, Meyer Sarafati, Michael P. Harris, Kenneth Rosen, Gerald Katcher, Daniel J. Cantor, William Tibbe, Janet Dadamo, Alvin J. Kalish, Sara Mund, Thelma Julis, Sidney, Goldstein and Schulnam Corp., a/k/a N. Shunam Inc., James Glucksman, Rattet & Pasternak, LLP, Harrison, NY, for appellees.

Barr & Rosenbaum, Spring Valley, NY, for appellee Marvin Barcham.

## MEMORANDUM & ORDER

BRIEANT, District Judge.

By appeals filed on May 18, 2001, Plaintiff–Appellant Barbara Balaber–Strauss (the "Trustee"), as Trustee of Churchill Mortgage Investment Corporation ("CMIC"), appeals a December 26, 2000 decision of the Bankruptcy Court dismissing her fraudulent transfer claims against brokers (the "Brokers") in a *Ponzi* scheme (the "scheme") which sought recovery of the Brokers' commissions earned by Appellees related to the scheme. *See Balaber–Strauss v. Sixty–Five Brokers (In re Churchill Mortgage Investment Corporation)*, 256 B.R. 664 (Bankr.S.D.N.Y.2000) (Hardin, B.J.).

■ Mr. Gerald P. Hirsch, a dentist, real estate broker and investment advisor operated several entities (the "Churchill entities" or the "Debtors") as a *Ponzi* scheme using new investors' money to repay earlier investors, primarily through the sale of fictitious mortgage participations and Certificate of Deposit investments. A *Ponzi* scheme is an investment scheme which is not supported by a legitimate underlying business venture. The investors are paid profits from the principal sums paid in by newly attracted investors. Usually those who invest in the scheme are promised large returns on their principal investments. The initial investors are often paid the sizable promised returns. This attracts additional investors. More and more investors need to be attracted into the scheme so that the

growing number of investors on top can get paid. The *Ponzi* scheme acquires its name from Charles K. Ponzi (1882 – 1949) who during an eight month period in 1920 swindled American investors for an amount in excess of $15 Million. Ponzi claimed that he could earn 50% interest in 90 days for clients by speculating in international postage reply coupons which he said were worth more in the United States than their cost in most foreign countries. He paid such interest to his initial investors solely out of the principal borrowed from subsequent investors. The scheme came to an end when Ponzi agreed with federal authorities to stop taking in new money until auditors could examine his books. Like Dr. Hirsch, Ponzi was convicted of mail fraud. The investors in Dr. Hirsch's scheme received interest, dividends and repayment of principal derived primarily from subsequent investments made by defrauded investors procured by the Brokers, who received commissions for their sales.

In 1993, the Securities and Exchange Commission commenced an action against Dr. Hirsch and the Churchill entities alleging violations of federal securities laws arising from the sale of unregistered securities in the form of mortgage participation notes and misrepresentations of material facts in connection with those sales. *See Securities and Exchange Commission v. Churchill Securities, Inc.*, 93 Civ. 7486 (S.D.N.Y.). In April 1996, the District Court entered a permanent injunction against Hirsch and the Churchill entities. In March of 1997, the District Court found that despite the injunction, the Churchill entities had continued to violate federal securities laws. The Court held Mr. Hirsch and the Churchill entities in contempt and appointed a Receiver to take control of the Churchill entities.

In April 1997, six creditors filed an involuntary Chapter 7 proceeding against CMIC. Plaintiff–Appellant was appointed as interim trustee. In June and July 1997, the Receiver filed voluntary Chapter 7 petitions for 14 additional entities, and Plaintiff–Appellant was appointed interim trustee in each case. Later, in July of 1997, 15 debtor cases were administratively consolidated under the caption *In re Churchill Mortgage Investment Corp.*, Case No. 97 B. 20967(ASH), and in November 1997, Plaintiff–Appellant became permanent trustee.

In September 1997, Dr. Hirsch was charged with sixteen counts of mail fraud based on his sales of mortgage participations and Certificate of Deposit investments. In April 1999, Hirsch pled guilty to three counts of mail fraud relating to the sale of mortgage participations, and three counts relating to the sale of Certificate of Deposit investments. He was sentenced to and is now serving a term of imprisonment and was ordered to make restitution in excess of $30 million.

The Trustee commenced separate adversary proceedings in the Bankruptcy Court against individuals and a few entities who were hired as brokers to originate mortgages and solicit investors in one or more of the Churchill entities. The Trustee sought to recover commissions totaling over $5 million paid by the Debtors to the Brokers for their services in the scheme. There are no allegations, and no evidence suggests that the Brokers had any knowledge about the fraudulent nature of the scheme at the time that they rendered their services.

A number of broker-defendants filed motions in the Bankruptcy Court for summary judgment or to dismiss asserting that "the commissions which were paid to them constituted fair, contemporaneous consideration for work and services actual-

ly performed in the ordinary course of business." The Bankruptcy Court treated all of the broker-defendants' motions as motions to dismiss and granted each of them judgment dismissing the claims of Plaintiff for the return of brokers' commissions as sought in Plaintiff's fraudulent conveyance claims. The Bankruptcy Judge found that the brokers' services constituted the requisite "value" in consideration for the commissions pursuant to 11 U.S.C. § 548(c). The Bankruptcy Court concluded that "a determination of whether value was given under section 548 should focus on the value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise." *In re Churchill,* 256 B.R. at 679. The Court emphasized that "the focus of the inquiry ... is the specific transaction the trustee seeks to avoid ... the *quid pro quo* exchange between the debtor and transferee, rather than an analysis of the transaction's overall value to a debtor as it relates to the welfare of the debtor's business." *Id.*

■ Section 548 of the Bankruptcy Code authorizes the trustee to avoid transactions which have the purpose or effect of removing property from a debtor's estate which properly should be used to repay creditors. Section 548(a)(1)(A) provides that a transfer of a debtor's interest in property may be avoided if the debtor "made such transfer ... with actual intent to hinder, delay, or defraud" any creditor. Similarly, Section 276 of the New York Debtor and Creditor Law provides that "every conveyance made ... with actual intent ... to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." It has been held that a debtor running a *Ponzi* scheme possesses actual intent to hinder, delay or defraud. *See Martino v. Edison Worldwide Capital,* 189

B.R. 425, 438 (Bankr.N.D.Ill.1995). However, section 548(c) of the Bankruptcy Code provides:

> except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

■ A transfer also may be avoided under a theory of constructive fraud. Section 548(a)(1)(B) provides that

> the trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily ...

> received less than a reasonably equivalent value in exchange for such transfer or obligation; and ... was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

■ The key issue before this Court, as it was before the Bankruptcy Court, is whether "reasonably equivalent value" was given and received in the transactions between the Debtors and the Brokers. "Value" is defined as "property or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor." 11 U.S.C. § 548(d)(2)(A). In order to determine "if a fair economic exchange has occurred in a case of suspected fraudulent transfer, the bankruptcy court must ana-

lyze all the circumstances surrounding the transfer." `5 COLLIER ON BANKRUPTCY ¶ 548.05[1][b]. Value is present if the debtor receives a fair equivalent in exchange for its property or obligation. *See HBE Leasing Corp. v. Frank*, 48 F.3d 623, 638 (2d Cir.1995).

In *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir. 1981), quoted by the Bankruptcy Court, the Court of Appeals explained that

> if the debtor receives property or discharges or secures an antecedent debt that is substantially equivalent in value to the property given or obligation incurred by him in exchange, then the transaction has not significantly affected his estate and his creditors have no cause to complain. By the same token, however, if the benefit of the transaction to the debtor does not substantially offset its cost to him, then his creditors have suffered.

In analyzing the exchange, the Court "must keep the equitable purposes of the statute firmly in mind, recognizing that any significant disparity ... will have significantly harmed the innocent creditors." *Rubin*, 661 F.2d at 994.

Appellant's primary argument here is that the services of the Brokers were not valuable to the Debtor and in fact, were detrimental because they deepened the Debtor's insolvency and furthered the commission of a crime.

The Brokers in this case performed innocent services that produced either mortgages or additional investors for the Debtors. The significance or consequence of the Broker–Debtor transaction as it relates to the Debtor's overall *Ponzi* scheme is of no relevance here. As the Court below concluded, the law does not require the Court to assess the transactions' impact on the Debtor's overall business. The law requires that the Court evaluate the "specific consideration exchanged by the debtor and the transferee in the specific transaction which the trustee seeks to avoid, and if the transfer is equivalent in value, it is not subject to avoidance under the law." *In re Churchill*, 256 B.R. at 680.

The Debtors received "value" in exchange for the commissions paid to the Brokers for performing in good faith a facially lawful and customary service for which they were retained by the Debtors. This Court agrees with the rationale employed by the Bankruptcy Court below in determining whether "value" passed between the Debtors and the Brokers in this case. The focus of the Court's inquiry is "the value of the goods and services provided rather than [ ] the impact that the goods and services had on the bankrupt enterprise" or the fact that it facilitated what later turned out to be a *Ponzi* scheme. *In re Churchill*, 256 B.R. at 679. The Brokers in this case were hired and compensated to initiate mortgages and solicit investors. They did so with no knowledge of any wrongdoing. There is neither an allegation of the Broker's knowledge of the *Ponzi* scheme nor of an unreasonably high or excessive commission paid to the Brokers for their standard broker services.

Accordingly, the decision of the Bankruptcy Court is affirmed.

SO ORDERED.