### In re FIRST COMMERCIAL MANAGEMENT GROUP, INC., Debtor.

### Sheldon L. Solow, Trustee, Plaintiff,

v.

### Walter Reinhardt, Defendant.

Bankruptcy Case No. 98 B 30408. Adversary No. 99 A 00994.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

May 9, 2002.

**232**

Sheldon L. Solow, Kaye Scholer, LLP, Chicago, IL, trustee.

## OPINION

BRUCE W. BLACK, Bankruptcy Judge.

This adversary proceeding is before the court on cross motions for summary judgment filed by the plaintiff, Sheldon L. Solow, the chapter 7 trustee, and the defendant, Walter Reinhardt. The trustee's complaint seeks to avoid alleged fraudulent transfers pursuant to sections 544 and 548 of the Bankruptcy Code.[1] For the reasons set forth below, the defendant's motion for summary judgment is granted, and the trustee's motion for summary judgment is denied.

## JURISDICTION AND PROCEDURE

The court has jurisdiction to entertain this matter pursuant to section 1334 of Title 28 of the United States Code, and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This matter is a core proceeding under section 157(b)(2)(E) and (H) of Title 28.

## FACTS AND BACKGROUND

The essential facts are not in dispute. The complaint alleges, and the defendant does not deny, that the debtor, First Commercial Management Group, Inc., was engaged in a Ponzi scheme[2] in which the debtor purported to sell pay telephones to investors who were identified by brokers. The scheme operated from 1995 until 1998. As inducement, investors were promised certain benefits, one of which was an annual return exceeding twelve percent of their investment. They were also guaranteed all of their money back if they decided to withdraw from the enterprise after three years. The debtor contracted to sell more than 6,000 pay telephones to more than 2,000 investors nationwide, but fewer than 1,500 of the pay telephones were actually placed and operated. The debtor made payments to investors from a pool of funds received from new investors rather than from profits derived from operating the pay telephones. The defendant served as a broker for the debtor, recruiting individuals who paid hundreds of thousands of dollars to purchase pay telephones from the debtor.

The defendant does not contest these general allegations. He denies, however, that he had knowledge of the fraudulent nature of the debtor's activities. He also objects to the legal conclusions the trustee would have me draw regarding the significance of his efforts to assist the debtor.

---

1. 11 U.S.C. §§ 544 and 548. Any reference to "section" is a reference to the Bankruptcy Code unless another reference is stated.

2. A Ponzi scheme, sometimes called a pyramid scheme, involves an enterprise which makes payments to investors from money received from more recent investors rather than from profits of a legitimate business enterprise. See *In Re Lake States Commodities, Inc.*, 253 B.R. 866, 869, n. 2 (Bankr.N.D.Ill. 2000).

Some facts are agreed to by the parties. Many other facts are uncontroverted because the trustee failed to take the necessary procedural steps to contest them.[3] In addition to the general findings set forth above, I specifically find and conclude as follows:

1. The debtor's overall business constituted a Ponzi scheme.

2. After performing a two month inquiry regarding the debtor and its principals, the defendant signed a contract with the debtor in which he agreed to find investors for the debtor's enterprise.

3. The defendant generated $888,450 for the debtor by finding investors.

4. The defendant received substantial commissions from the debtor for finding the investors. The commissions totaled between 6.75% and 9.12% of the money generated.

5. The percentage of the commissions paid to the defendant for locating investors was in line with commissions paid to other individuals performing similar services in the pay telephone industry.

6. The defendant sold seventy-one pay telephones to investors for the debtor. After the sales, the defendant performed substantial follow-up services with respect to the investors and verified that seventy of the seventy-one pay telephones were in place and generating income to the investors.

7. The defendant was not aware that the debtor was operating a Ponzi scheme.

8. The defendant was not aware that any of the debtor's activities were fraudulent.

9. The defendant had no fraudulent intent and performed no fraudulent activities in connection with his services for the debtor.

## DISCUSSION

### Standard on Cross Motions for Summary Judgment

■ The pendency of cross motions for summary judgment does not require that one of the motions be granted. 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 (3d ed.1998). Each motion must be evaluated independently. Under Federal Rule of Civil Procedure 56, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056, a motion for summary judgment must be granted if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

### Trustee's Complaint

The trustee's complaint consists of two counts. The first is entitled "Avoidance of Fraudulent Transfers, 11 U.S.C. § 548."[4]

---

3. The trustee provided no evidence or affidavits in support of his motion for summary judgment or to contradict the affidavit attached to the defendant's motion. Further, the trustee failed to respond to the defendant's affirmative defense and the defendant's request to admit facts. Accordingly, the facts alleged in the defendant's affidavit, affirmative defense, and request to admit facts are all deemed uncontroverted.

4. Section 548(a)(1) of the Bankruptcy Code provides, in pertinent part:

   (a)(1) The trustee may avoid any transfer of an interest of the debtor in property ... that was made ... on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
   (A) made such transfer ... with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or

After eighteen paragraphs of allegations common to both counts, the first count alleges: "Any commissions paid to [the defendant] within one year of the petition date by [the debtor] were made for less than reasonable equivalent value." The next and final paragraph alleges: "Because [the debtor] was engaged in a Ponzi scheme, it was insolvent as a matter of law and commissions paid to [the defendant] were and are fraudulent transfers as a matter of law."

The second count is entitled "Avoidance of Fraudulent Transfers, 11 U.S.C. § 544 and 740 ILCS 160/1," and its prayer for relief refers to "Section 5 of the Illinois Uniform Fraudulent Transfer Act." [5] The allegations in the second count are identical to those in the first except there is no limitation regarding when the commissions were paid.

In general, section 548(a)(1) of the Bankruptcy Code provides two theories of recovery. The cause of action in section 548(a)(1)(A) is often referred to as "actual fraud" or "fraud in fact" because of the requirement that the transferor possess "actual intent to hinder, delay, or defraud."

The cause of action under section 548(a)(1)(B) is often called "constructive fraud" or "fraud in law" because it requires no such intent.

The title of the second count of the complaint, which refers to section 544 of the Bankruptcy Code and to the Illinois Uniform Fraudulent Transfer Act (UFTA), invokes that part of section 544 which allows the trustee to pursue a creditor's rights under state law. The combination of section 544(b) and section 5(a) of the Illinois UFTA allows the trustee to pursue causes of action analogous to those under section 548(a)(1) but without the one year statute of limitations applicable under section 548.[6]

### Trustee's Motion for Summary Judgment

#### Actual Fraud

In support of his motion for summary judgment, the trustee first argues that the commission payments to the defendant "are avoidable fraudulent transfers as a matter of law because they were made with actual intent to hinder, delay, or defraud creditors." The Defendant argues

after the date that such transfer was made, . . ., indebted; or
(B)(i) received less than a reasonably equivalent value in exchange for such transfer . . .; and
(ii)(I) was insolvent on the date that such transfer was made . . ., or became insolvent as a result of such transfer. . . .

5. The pertinent part of section 544 reads:
[T]he trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.
The Illinois version of the Uniform Fraudulent Transfer Act is set forth at 740 ILCS 160/1 et seq. The pertinent part of section 5(a) reads:
A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's

claim arose before or after the transfer was made . . . if the debtor made the transfer or incurred the obligation:
(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
(2) without receiving a reasonably equivalent value in exchange for the transfer . . ., and the debtor:
(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

6. *Helms v. Roti (In re Roti)*, 271 B.R. 281, 300 (Bankr.N.D.Ill.2002).

that the trustee's actual fraud argument is not supported by the pleadings and that I should not consider it. The applicable procedural rule [7] provides that allegations of fraud must be pleaded with particularity. At the very least, a complaint must be specific enough to give a defendant full notice of the claims being asserted and to allow a defendant to prepare responsive pleadings. *See* 5 *Collier on Bankruptcy* § 548.04[3](15th ed. rev.2001).

The first count of the trustee's complaint does not specify which portion of section 548 it seeks to invoke. Although it is clear from the allegations regarding "reasonable equivalent value" and insolvency that the trustee is asserting a cause of action pursuant to section 548(a)(1)(B), there is nothing in the complaint to give the defendant notice of a section 548(a)(1)(A) assertion. Except for the reference to a Ponzi scheme, there is not even a vague reference to an actual intent to defraud.

Similarly, the second count does not specify which portion of section 5 of the Illinois UFTA it is based upon. Again, although the cause of action for constructive fraud can be recognized because of the allegations regarding value and insolvency, there is nothing to alert the defendant to a charge of actual fraud. Consequently, the actual fraud argument raised in the trustee's motion for summary judgment is not supported by the allegations in either count, and I will not consider it.

### Constructive Fraud

■ As noted, each count of the complaint adequately pleads a cause of action for constructive fraud, the first count based on section 548(a)(1)(B) of the Bankruptcy Code, and the second count based on section 544(b) of the Bankruptcy Code and section 5(a) of the Illinois UFTA. To prevail on this cause of action under either count, the trustee must prove both that the debtor received less than a reasonably equivalent value in exchange for the commission payments and that the debtor was insolvent at the time of the transfers.[8]

The issue of insolvency is not in dispute here, because by definition a Ponzi scheme inevitably becomes insolvent at some point. What the parties vigorously dispute is the issue of reasonably equivalent value. The trustee contends that the commissions were paid for less than reasonably equivalent value *as a matter of law* because they were paid in the context of a Ponzi scheme. The defendant responds that he performed innocently, that his investors actually received pay telephones, and that he knew nothing about the debtor's fraudulent activities.

■ The critical issue is whether reasonably equivalent value was given and received when the defendant performed services for the debtor and the debtor paid commissions to the defendant in return. Some of the rules governing this determination are clear. The measurement of reasonably equivalent value is a question of fact. *In re Image Worldwide, Ltd.,* 139 F.3d 574, 576 (7th Cir.1998). The Court of Appeals for the Seventh Circuit has recognized that there is no fixed formula for determining reasonable equivalence. *Barber v. Golden Seed Co., Inc.,* 129 F.3d 382, 387 (7th Cir.1997). The determination depends instead on all of the facts of each case. *Id.* Important elements in the determination of reasonable equivalence include fair market value and whether the transaction between the parties was at arms length. *Id.* (citing *Bundles v. Baker,* 856 F.2d 815, 824 (7th Cir.1988)). A court must make a determination of whether

---

7. Fed.R.Civ.P. 9(b), applicable to adversary proceedings by Fed. R. Bank. P. 7009.

8. *See* the statutes quoted in notes 4 and 5.

reasonably equivalent value exists by comparing the value of what was transferred with the value of what was received. *Id.*

In this case the trustee urges me to focus on the value of the defendant's services in the context of a Ponzi scheme. He argues, in effect, that because the enterprise has no legitimate purpose there can be no value in perpetuating it. His most persuasive authority for this argument is a case decided by Judge Schmetterer of this district; *Martino v. Edison Worldwide Capital (In re Randy),* 189 B.R. 425 (Bankr.N.D.Ill.1995). The defendant, on the other hand, urges me to focus more narrowly on the contractual relationship between the defendant and the debtor and the *quid pro quo* thereunder. His primary authority is a recent case, *In re Churchill Mortgage Inv. Corp.,* 256 B.R. 664 (Bankr. S.D.N.Y.2000), an opinion which disagrees with both the analysis and result of *In re Randy.*

The *Randy* and *Churchill* cases do decide the precise issue before me, reaching opposite conclusions. The *Randy* analysis begins with established principles of Ponzi scheme jurisprudence: when facing fraudulent conveyance actions, investors may keep the principal amount of their investments, but they may not keep any profits from the scheme. *In re Randy,* 189 B.R. at 437. The rationale of these cases is described as follows:

> Most of these decisions reason, as a matter of law, that the investor/defendants in these fraudulent transfer actions should not be allowed to keep payments in excess of their original investments since they would be profiting at the expense of those investors who enter the scheme late and receive nothing. The fact that such investors got into the scheme early enough to make a

profit should not entitle them to a reward at the expense of other investors who entered the scheme later.

*Id.* at 437–38 (citations omitted). The *Randy* analysis then concludes:

> The underlying reasoning that courts have used to find that profits paid in a Ponzi scheme to innocent investors are fraudulent transfers applies equally well to commissions paid to brokers who promoted or aided the investment scheme, whether or not they had any culpable intent. Therefore, as a matter of law, when brokers are paid commissions for their efforts in promoting a Ponzi scheme, these commissions are fraudulent transfers under §§ 548 and 544 of the Code.

*Id.* at 438.

The *Randy* case contained causes of action for both actual fraud and constructive fraud. Regarding the actual fraud count, the opinion concludes, as do nearly all of the cases,[9] that the principal of the Ponzi scheme, the debtor Randy, had the actual intent to defraud the investor-creditors. *Id.* at 440. Regarding the constructive fraud counts, the opinion analyzes the issue of reasonably equivalent value as follows:

> To determine whether Debtor received value for the transfer, the Court needs to first assess the bargain that Debtor made and which gave rise to Debtor's liability to his creditors ... Debtor's liability for the commissions arose under whatever agreement he made with each of the Defendants. Therefore, whether Debtor was really indebted to Defendants depends on whether or not Defendants had a valid, enforceable

---

**9.** Mark A. McDermott, *Ponzi Schemes and the Law of Fraudulent and Preferential Transfers,* 72 Am. Bankr.L.J. 157, 173–174 (Spring 1998).

right under their agreement with Debtor to receive the commissions.

*Id.* at 440–41.

The *Randy* opinion then cites cases holding that the contract between the Ponzi scheme principal and the investors is not enforceable in excess of the amounts invested. That is, the contracts could not be enforced by investors seeking profits. The opinion then analogizes again between profits and commissions:

> These courts have decided that the contract that underlies the transaction is illegal, and therefore no value could have been given by the transferee to the debtor for the transfer. For the reasons that follow, this Court concludes that this argument applies even more forcefully to brokers who have received commissions for helping perpetrate the Ponzi scheme.

*Id.* at 441.

The opinion then discusses a possible exception to the general rule that illegal contracts will not be enforced. The exception would allow an *innocent party* to enforce the contract because the rationale for refusing enforcement is not present. The opinion then notes that in some circumstances courts conclude that the public policy against enforcing illegal contracts will prevail over the public policy of protecting innocent parties. Relying primarily on *In re Independent Clearing House*, 77 B.R. 843 (D.Utah 1987), which refused enforcement of a contract for an investor seeking Ponzi scheme profits, and *Dicello v. Jenkins (In re International Loan Network)*, 160 B.R. 1 (Bankr.D.D.C.1993), the opinion concludes:

> [E]nforcing any agreements between Randy and these Defendants would only exacerbate the harm to the debtor's creditors. Any contracts of the Defendants would be unenforceable, and no value was or could legally be given pursuant thereto to the Debtor or the Debtor's bankruptcy estate.

*In re Randy,* 189 B.R. at 441.

In contrast to the *Randy* analysis, the *Churchill* opinion focuses on the discrete transaction between the debtor and the defendant, without regard to the nature of the debtor's overall enterprise. *Churchill,* 256 B.R. at 677–79. The opinion contends that this narrow focus is compelled by the language of the pertinent statutes. Section 548(a)(1)(B) of the Bankruptcy Code refers to "less than a reasonably equivalent value *in exchange for such transfer.*" Likewise, section 548(c) affords a transferee a defense if the transferee "takes for value and in good faith . . . to the extent that such transferee . . . gave value to the debtor *in exchange for such transfer . . .*" The parallel provision of New York law, applicable in *Churchill,* contains similar language. Section 5(a) of the Illinois UFTA also refers to "without receiving a reasonably equivalent value *in exchange for the transfer.*" After reviewing the case law, the *Churchill* opinion then states:

> [I]t is evident that the analysis which must be used to determine value is a commercial equation which looks to the actual transaction between the debtor and the transferee, and the Court must measure "what was given and received" *in that transaction.*

*Churchill,* 256 B.R. at 679.

The *Churchill* opinion also rightly observes that it would be a legal fiction to say that brokers who produce investors to provide money for a Ponzi scheme are providing nothing of value. *Id.* at 681. Money is valuable even when used for illegal purposes.

I conclude that the *Churchill* analysis regarding the proper method of decision is persuasive. I also believe that one of the premises of the *Randy* opinion—that prof-

its and commissions should be treated the same—does not withstand scrutiny. The fundamental distinction between profits and commissions was recognized in *In re Scholes*, 56 F.3d 750 (7th Cir.1995)(Posner, J.). In *Scholes*, the receiver for corporations owned by a Ponzi scheme principal brought fraudulent transfer actions against the principal's former spouse, against one of the Ponzi scheme investors who had received profits, and against religious organizations that received funds from the corporations. The court determined, as a matter of law, that neither the Ponzi scheme investor nor the religious organizations paid valuable consideration for the property transferred by the corporations. As a result, those transfers were recoverable by the receiver as fraudulent conveyances.

With respect to the Ponzi scheme investor, Judge Posner reasoned that he was:

> entitled to his profit only if the payment of that profit to him, which reduced the net assets of the estate now administered by the receiver, was offset by an equivalent benefit to the estate.... It was not. A profit is not offset by anything; it is the residuum of income that remains when costs are netted against revenues.

*Scholes*, 56 F.3d at 757.

Regarding the former spouse, however, the *Scholes* court determined that to the extent she had any legitimate claims against the principal, payments made by the principal to her would not constitute fraudulent conveyances. The court reasoned that if the principal's former spouse:

> had valid claims against [the principal] equal to the amount of money he gave her, so that by giving it to her he received consideration in the form of a

release of commensurate legal obligations to her, this would be adequate and not merely nominal consideration. There would be no net depletion of the estate....

*Id.* at 758.

In addition to this analytic difference between profits and commissions, there is also an ethical difference between an innocent broker who performed services and less than innocent investors who, at best, tried to take advantage of a "deal" that should have been seen as too good to be true.

The *Churchill* court had been urged to follow *In re Randy*, and in·declining to do so it identified what it described as the "fatal legal flaw" in the reasoning adopted by the *Randy* court:

> [I]t focuses not on a comparison of the values of the mutual consideration actually exchanged in the transaction between the Broker and the Debtor, but on the value, or more accurately stated, the supposed significance or consequence of the Broker Debtor transaction in the context of Debtors' whole Ponzi scheme.... [T]he statutes and case law do not call for the court to assess the impact of an alleged fraudulent transfer in a debtor's overall business. The statutes require an evaluation of the specific consideration exchanged by the debtor and the transferee in the specific transaction which the trustee seeks to avoid, and if the transfer is equivalent in value, it is not subject to avoidance under the law.

*Churchill*, 256 B.R. 664, 680.[10]

▉ I am persuaded by the analysis of the *Churchill* court regarding how reason-

---

**10.** On appeal, the District Court affirmed the decision of the *Churchill* court, recognizing that the "significance or consequence of the Broker Debtor transaction as it relates to the Debtor's overall *Ponzi* scheme is of nonrelevance," because the law does not require the

ably equivalent value should be determined under these circumstances, and I respectfully disagree with the *Randy* court's approach. I find it appropriate to analyze whether reasonably equivalent value exists by focusing on the consideration exchanged between the debtor and the defendant, rather than focusing on the conduct of debtor's management, which is extraneous to the exchange that the trustee is seeking to avoid.

Having settled on the proper methodology, the next step is to apply it to the specific exchange between the debtor and the defendant in the instant case. The defendant here performed services for the debtor by recruiting investors for the debtor's business enterprise, and then performing follow up services with respect to such investors. To the extent he did so, the defendant has a claim against the debtor equal to the value of the services he performed. There was no depletion of the bankruptcy estate when the commissions were paid to the defendant because, in paying such commissions, the debtor received adequate consideration, or reasonably equivalent value, in the form of a release of any claims the defendant could have asserted against the estate for unpaid commissions. On these grounds, I find that reasonably equivalent value was exchanged when the debtor paid commissions to the defendant. As such, the trustee's section 548(a)(1)(B) cause of action must fail.

#### 11 U.S.C. § 548(c)

█ Even if a transfer were to fall within section 548(a)(1)(A) or (B), section 548(c)

of the Bankruptcy Code could shelter the commission payments from the trustee's avoidance powers if the defendant took the commissions "for value and in good faith." [11] Consequently, even if the trustee had successfully pleaded a section 548(a)(1)(A) cause of action, or proved a section 548(a)(1)(B) claim, he would still be unable to recover the commissions paid if the defendant received the commissions in exchange for value and in good faith.

For section 548 purposes, the term "value" is defined as "property, or satisfaction or securing of a present or antecedent debt of the debtor ..." in section 548(d)(2)(A). In the instant case, the debtor entered into a contract with the defendant whereby the debtor agreed to pay the defendant commissions for finding investors for the debtor's enterprise. The defendant gave value, or consideration, to the debtor by locating investors pursuant to the terms of such contract. In return, the debtor incurred the obligation to pay the defendant for recruiting investors. This obligation constituted a debt that was satisfied through the payment of commissions, and the satisfaction of this obligation falls squarely within section 548(d)(2)(A). See *Merrill v. Allen (In re Universal Clearing House Company,)* 60 B.R. 985, 998–99, (D.Utah 1986).

The second issue under section 548(c) is whether the defendant acted in good faith in receiving the commissions. One undisputed fact in this case is that the commissions paid to the defendant for locating investors for the debtor were within the

---

Court to assess the transaction's impact on the debtor's overall business. *Balaber-Strauss v. Lawrence,* 264 B.R. 303 (S.D.N.Y. 2001).

**11.** Section 548(c) of the Code provides in pertinent part:

Except to the extent that a transfer ... voidable under this section is voidable un-

der section 544, 545, or 547 of this title, a transferee ... of such a transfer ... that takes for value and in good faith ... may retain any interest transferred ... to the extent that such transferee ... gave value to the debtor in exchange for such transfer. . . .

range of commissions earned by others for performing similar services in the pay telephone industry. It is also not disputed that the defendant performed his services without any knowledge that the debtor's activities were fraudulent or that the debtor was operating a Ponzi scheme. Moreover, the facts do not show that the defendant's actions were in any way fraudulent. Accordingly, I conclude the defendant acted in good faith when receiving his commissions. I further conclude that he would be protected from any possible recovery by the trustee under section 548(a)(1)(A) or (B) through the shelter provided by section 548(c).

### 11 U.S.C. § 544

As noted above, the second count of the trustee's complaint is brought under section 544 of the Bankruptcy Code and under section 5 of the Illinois UFTA. Subsection (b) of section 544 allows a trustee to avoid a transfer of a debtor's interest in property if an unsecured creditor could have done so under the applicable state law. *Leibowitz v. Parkway Bank & Trust, Co. (In re Image Worldwide, Inc.)*, 139 F.3d 574, 576–77 (7th Cir.1998). In this count, the trustee seeks to avoid and recover the commission payments pursuant to sections 5 and 6 of the Illinois statute which is analogous to section 548(a)(1)(A) and (B) of the Bankruptcy Code. Except for different statutes of limitations, the state and federal statutes are functional equivalents, and the analysis applicable to the first count is also applicable to the second.[12] Accordingly, the trustee cannot prevail on the second count of the complaint for the reasons stated above regarding the first count.

### The Defendant's Motion for Summary Judgment

Because I have resolved the threshold issue of "reasonably equivalent value" in favor of the defendant, and because that issue prevents the trustee from recovering under either count of the complaint (as well as providing the defendant an affirmative defense), it is clear that the defendant is entitled to judgment as a matter of law. Accordingly, the defendant's motion for summary judgment must be granted.

### Conclusion

For the reasons stated herein, the defendant's motion for summary judgment is GRANTED, and the trustee's cross motion for summary judgment is DENIED. This Opinion will serve as findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. A separate judgment will be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.

---

12. *See In re Roti, supra* note 6; *In re Randy,* 189 B.R. at 443.