In re ROTHSTEIN ROSENFELDT ADLER, P.A., Debtor.

Herbert Stettin, Chapter 11 Trustee, Plaintiff,

v.

The Dan Marino Foundation, Inc., Defendant.

Bankruptcy No. 09–34791–BKC–RBR. Adversary No. 12–01317–RBR.

United States Bankruptcy Court, S.D. Florida.

Oct. 31, 2012.

Charles H. Lichtman, Fort Lauderdale, FL, for Plaintiff.

G. Steven Fender, Esq., West Palm Beach, FL, for Defendant.

### ORDER GRANTING THE DAN MARINO FOUNDATION, INC.'S MOTION FOR SUMMARY JUDGMENT [D.E. 17]

RAYMOND B. RAY, Bankruptcy Judge.

**THIS MATTER** came before the Court for a hearing on September 5, 2012 on the Defendant's, The Dan Marino Foundation, Inc. (the "Foundation"), Motion for Summary Judgment and Incorporated Memorandum of Law (the "Motion") [D.E. 17], the Plaintiff's (the "Trustee") Response in Opposition to The Dan Marino Foundation, Inc.'s Motion for Summary Judgment and Incorporated Memorandum of Law (the "Response") [D.E. 28], and, The Dan Marino Foundation, Inc.'s Reply to Plaintiff Herbert Stettin's Response in Opposition to the Foundation's Motion for Summary Judgment and Incorporated Memorandum of Law (the "Reply") [D.E. 30]. The Court has also considered the affidavit of Mary Partin ("Partin Aff.") [D.E. 18] and Joel Glick ("Glick Aff.") [D.E. 29]. For the reasons stated below, the Court grants the Foundation's Motion.

### FINDINGS OF FACT

1. The Foundation is a § 501(c)(3) charitable organization founded in 1992. Partin Aff. ¶ 2. It works to foster the independence of children and young adults with autism and special needs by supporting treatment programs, outreach services, scientific research, and employment and daily living training. *Id.* The Foundation's founders are Dan Marino and his wife, Claire. *Id.* The Foundation functions primarily through public and private charitable donations. *Id.* at ¶¶ 2–3. The Trustee seeks to recover multiple transfers that Rothstein Rosenfeldt Adler, P.A. ("RRA") and Scott Rothstein made to the Foundation.

2. RRA agreed to donate a total of $500,000.00 between September 18, 2006 and September 18, 2011. Partin Aff. ¶¶ 5–6, and Exhibits "A" and "B". Pursuant to the written pledge agreement between RRA and the Foundation the following payments were made to the Foundation, which relates to the different check numbers discussed herein:

a. RRA check no. 18608 dated March 30, 2007 (clearing on April 26, 2007) for $25,000.00. Exhibit "A" to Complaint; Exhibit "B" to Partin Aff.

b. RRA check no. 18609 dated June 30, 2007 (clearing on July 3, 2007) for $25,000.00. Exhibit "A" to Complaint; Partin Aff. at Exhibit "D."

c. RRA check no. 18610 dated September 30, 2007 (clearing on October 3, 2007) for $25,000.00. Exhibit "A" to Complaint; Partin Aff. at Exhibit "F."

d. RRA check no. 18611 dated December 31, 2007 (clearing on December 28, 2007) for $25,000.00. Exhibit "A" to Complaint; Partin Aff. at Exhibit "H."

3. The Foundation received RRA check no. 1987 dated May 22, 2007 (clearing on May 25, 2007) for $250.00. Exhibit "A" to Complaint; Partin Aff. at Exhibit "K." RRA made this $250.00 payment to the Foundation to purchase a seat at the Runway/84 Charity Luncheon that Scott Rothstein attended on May 23, 2007. Partin Aff. ¶ 10. The Runway/84 Charity Luncheon was a fundraiser for the Foundation, which included a meal and was attended by approximately 100 people from the South Florida business community. *Id.* While at the auction, RRA purchased an item of sports memorabilia for $1,000.00 at a competitive bid auction, as discussed below in paragraph 5. *Id.* RRA received the item purchased, as well as a corresponding tax deduction receipt for $700.00. *Id.*

4. The Foundation received RRA check no. 21787 dated October 17, 2007 for $25,000.00 (clearing on October 17, 2007). Exhibit "A" to Complaint; Partin Aff. at Exhibit "M". Scott Rothstein asked Dan Marino to speak along with form Governor Charlie Christ at a function RRA was hosting. Partin Aff. ¶ 11. Dan Marino's customary fee for appearing and speaking at such a function at this time was $25,000.00, but Dan Marino requested that RRA pay the fee to the Foundation instead to him personally. *Id.* This appearance fee was charged in the ordinary course to anyone for whom Dan Marino agreed to appear and speak, such as in this situation at RRA's request. *Id.*

5. The Foundation received RRA check no. 21660 dated October 5, 2007 (clearing on October 29, 2007) for $1,000.00. Exhibit "A" to Complaint; Partin Aff. at Exhibit "J". RRA made this $1,000.00 payment to purchase an autographed Hall of Fame custom framed picture purchased at a competitive auction held during the Runway/84 Charity Luncheon that is referenced in Paragraph 2 above. Partin Aff. ¶ 10.

6. The Foundation received RRA check no. 22713 dated December 14, 2007 (Clearing on December 28, 2007) for $3,000.00. Exhibit "A" to Complaint; Partin Aff. at Exhibit "O". RRA made this $3,000.00 payment to purchase three seats at a charity fundraiser dinner hosted by the Foundation at Jackson's Steak House. Partin Aff. ¶ 12. This charity dinner for $3,000.00 included three seats and was attended by actual or potential client of RRA. *Id.* The $1,000.00 per person included a meal and cigars. *Id.* The price per person was the same cost for anyone who attended the event. *Id.* The purpose of the Jackson's Steak House function was to raise money for the Foundation. *Id.* It was attended by 125 people from the South Florida business community. *Id.*

7. The Foundation received Scott Rothstein personal check no. 7623 dated December 2, 2006 (clearing on February 13, 2007) for $79,750.00 from Gibraltar Bank. Exhibit "B" to Complaint; Partin Aff. ¶ 13 and Exhibit "R." This check was payment for purchasing a nine person table ($9,000.00 at $1,000.00 per person) for

a charity dinner at Jackson's Steak House to raise money for the Foundation. Partin Aff. ¶ 13. The dinner featured an auction where Scott Rothstein purchased, after competitive bidding, cigars ($18,000.00), a Miami Heat ticket package ($12,000.00), an autographed MVP football helmet ($40,-000.00), and Dundee gloves and picture ($750.00). *Id.* The ticket price included the table for nine, which was attended by actual or prospective RRA clients or by associates of Scott Rothstein and RRA, as well as, dinner and cigars for each attendee. *Id.* RRA provided an initial check to the Foundation for all of these items, but before the Foundation negotiated the check, Scott Rothstein indicated to the Foundation that these items were for his personal use and that he would replace the RRA check with a personal check. *Id.* He did so a few months later. *Id.* The Foundation provided Scott Rothstein with a receipt for a tax deduction of $72,150.00, which listed the items he purchased. *Id.* and Exhibit "S". The items purchased by Scott Rothstein were valued higher than the purchased price, but the items had been donated by third parties with the intent that they be sold to benefit the Foundation. *Id.*

8. When Scott Rothstein's personal check no. 7623 was presented by the Foundation to Gibraltar Bank on February 13, 2009, that account was overdrawn by $84,936.86, but Gibraltar Bank honored the check. Glick Aff. ¶¶ 12–14. A credit from an RRA account to this Scott Rothstein personal account on March 30, 2009 brought it to a positive balance. *Id.* at ¶¶ 15–16.

9. The Foundation received Scott Rothstein personal check no. 8685 dated March 20, 2008 (clearing on March 24, 2008) for $50,000.00 from Gibraltar Bank. Exhibit "B" to Complaint; Partin Aff. at Exhibit "T." Scott Rothstein attended a competitive bid charity auction at which he won and purchased an original Frank Mueller wristwatch for $50,000, which the Foundation provided to him. Partin Aff. ¶ 14. Scott Rothstein received a tax deduction receipt providing him with a $30,000.00 charitable tax deduction, reflecting the watch's cost of $20,000.00. *Id.* and Exhibit "U."

10. When Scott Rothstein's personal check no. 8685 was presented by the Foundation to Gibraltar Bank on March 24, 2008, that account was overdrawn by $180,464.87, but Gibraltar Bank honored the check. Glick Aff. ¶¶ 17–19. A credit from an RRA account to this Scott Rothstein personal account on April 3, 2009 brought it to a positive balance. *Id.* at ¶¶ 20–21.

11. The Foundation did not do business with RRA, invest in RRA, or know Scott Rothstein was operating a *Ponzi* scheme from RRA. Partin Aff. ¶ 15. The Foundation had no reason to question or investigate RRA or Scott Rothstein's finances. *Id.*

12. Alleging actual and constructive fraud, the Trustee contends that these transfers are avoidable and subject to recovery under 11 U.S.C. §§ 548(a)(1)(A) and (B), 544, and 550, as well as, Florida Statute §§ 726.105(1)(a), 726.105(1)(b), and 726.106(1).

### CONCLUSIONS OF LAW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c), made applicable in these proceedings by Fed. R. Bankr.P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265

(1986). An issue of material fact is genuine when a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In a light that favors the nonmoving party, the Court may make reasonable inferences from the factual record. *Crawford v. Carroll*, 529 F.3d 961, 964 (11th Cir.2008).

The nonmoving party must set forth specific facts showing there is a genuine issue of material fact to avoid an entry of a summary judgment. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The existence of a material factual dispute is sufficient only if the disputed fact is determinative of the outcome. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. If evidence opposing summary judgment is merely colorable or is not significantly probative, summary judgment may be granted. *Id.* at 249–50, 106 S.Ct. 2505. Such specific facts must go beyond the mere allegations and denials of the pleadings. *Id.* at 256, 106 S.Ct. 2505. If a Trustee does not contradict or raise factual allegations from an affidavit submitted by a defendant in a *Ponzi* avoidance action then those facts are admitted for purposes of summary judgment. *See Solow v. Reinhardt (In re First Commercial Management Group, Inc.)*, 279 B.R. 230, 233 n. 3 (Bankr.N.D.Ill.2002).

## I. *Fraudulent Transfer*

### a. RRA's Eight Transfers to the Foundation

The Trustee seeks to recover the four payments of $25,000.00 each from RRA to the Foundation for the total of $100,000.00 for the charitable contributions; the $25,000.00 appearance fee paid by RRA for Dan Marino's attendance and participation at the RRA function in South Beach; the $250.00 for RRA's ticket to a charity auction; the $1,000.00 paid by RRA for an item won at that charity lunch/auction; and $3,000.00 paid by RRA to the Foundation for three seats at a charity dinner at Jackson's Steak House. The Foundation assumes that the Trustee can satisfy his burdens under § 548(a) and Florida Statute §§ 726.105(1) and 726.106(1). However, the Foundation asserted valid defenses to this action as a matter of law. *See* 11 U.S.C. § 548(c), and Florida Statute § 726.109(4).

Section 548(c) provides in relevant part that "a transferee or obligee of such a transfer [under § 548(a) ] or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation." 11 U.S.C. § 548(c). An antecedent debt is a debt that is incurred before the transfer at issue. *Noland v. Morefield (In re National Liquidators, Inc.)*, 232 B.R. 915, 920 (Bankr.S.D.Ohio 1998). In the context of an action under Section 548, the legislative history of the Bankruptcy Code reflects Congress' desire to provide that the terms "claim," "debt," and "antecedent debt" be construed as broadly as possible. *Ohio v. Kovacs*, 469 U.S. 274, 279, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985). "The Bankruptcy Code does not require that a 'debt' be a contractual liability. Instead, 'debt' is defined as a liability on a 'right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.'" *Wyle v. Rider (In re United Energy Corp.)*, 944 F.2d 589, 595–96 n. 5 (9th Cir.1991) (citing 11 U.S.C. § 101(5)(A)). The four RRA transfers for $25,000.00 were charitable donations made pursuant to a pre-existing pledge agreement, which

obligated RRA to donate $500,000.00 to the Foundation between September 18, 2006 and September 18, 2011. Partin Aff. ¶¶ 5–9, and Exhibits "A," "B," "D," "F," and "H."

▮ The Foundation received the four $25,000.00 payments from RRA for "value" because they were received by the Foundation in satisfaction of an antecedent debt or obligation of RRA to the Foundation pursuant to the pledge agreement. An antecedent debt merely requires the Foundation to have a "claim" or a "right to payment," even if it does not rise to a contractual obligation. *In re United Energy Corp.,* 944 F.2d at 595–96; *Lustig v. Weisz and Associates, Inc. (In re Unified Commercial Capital, Inc.),* 260 B.R. 343, 353 (Bankr.W.D.N.Y.2001). These transfers constitute "value" satisfying an antecedent and pre-existing obligation. The pledge agreement entered into by RRA was entered into in good faith by the Foundation, was a customary and routine arm's length transaction, and was a typical arrangement that the Foundation participated with many other donors. The payments were received in the same manner. These contributions raised RRA's profile in the community, which provided it with additional intangible value. Even if the enterprise later turned out to be a *Ponzi* scheme, the benefit was facially lawful and customary. *See Balaber–Strauss v. Lawrence,* 264 B.R. 303, 308 (S.D.N.Y.2001).

▮ This Court concludes that participating in a competitive auction in an open market establishes that reasonably equivalent value was provided. If a competitive market set the price by the bidding procedures of the auction, it establishes the reasonably equivalent value. *See Hemstreet v. Brostmeyer (In re Hemstreet),* 258 B.R. 134, 139 (Bankr.W.D.Pa.2001) (holding that the context of a tax sale, "the price received at a properly conducted,

noncollusive tax sale auction constitutes reasonably equivalent value. . . ."). RRA's transfer to the Foundation for $250.00 was for a ticket to a charity lunch with over 100 attendees from the South Florida community, and the related transfer for $1,000.00 was for the purchase of an item after a competitive bid auction. Partin Aff. ¶ 10. The facts reflect that the Foundation provided "value" to RRA that is in accordance with what RRA paid. RRA received a seat at a lunch along with a meal, and received an item of sports memorabilia. *Id.* The auction was open to the public, anyone attending could bid the amount of their choosing with the highest bidder winning and purchasing the item. Scott Rothstein attended this event on behalf of RRA and won the item against other bidders. The auction and attendance was an arm's length transaction and the funds were received by the Foundation from RRA in good faith.

▮ The $3,000.00 transfer from RRA to the Foundation was for three seats at a charity event for $1,000.00 each, including a meal and cigars for each at Jackson's Steak House, which Scott Rothstein and two other RRA associates attended. The Foundation hosted this event for anyone wishing to donate to the Foundation and meet other South Florida business professionals. RRA voluntarily purchased these tickets at this price in an arm's length transaction. The Foundation was hosting the event in good faith to raise money for its charitable purposes. Attendance raised RRA's profile in the community.

▮ The final RRA transfer to the Foundation was Dan Marino's fee for attending and speaking at a large RRA celebrity event. The $25,000.00 RRA paid was assigned to the Foundation by Dan Marino for his routine and customary appearance fee. The transaction was en-

tered into in good faith by the Foundation. Dan Marino is a world famous Hall of Fame quarterback. His attendance and speaking at a large RRA celebrity event raised the profile of RRA, assisted its business, and provided sufficient value to RRA.

Therefore, the Foundation provided value for all of the aforementioned transfers. For the same reasons set forth above, the Trustee cannot recover these transfers under § 548(c) and Florida Statute § 726.109(4) because the Foundation has proved the defenses under 11 U.S.C. § 548(c), and Florida Statute § 726.109(4). This merits the Court's entry of summary judgment in favor of the Foundation.

### b. Two Transfers from Scott Rothstein's Personal Account

The Trustee also seeks to set aside the two transfers to the Foundation that it received from Scott Rothstein's personal account at Gibraltar Bank for $79,750.00 for the charity dinner auction, items purchased there, and the $50,000.00 watch purchased at another charity auction. The Trustee contended that these transfers were funded from Scott Rothstein's personal accounts with RRA money that had been placed into that account. Based on that allegation, the Foundation is an immediate or mediate transferee under § 550(a)(2), and afforded the defenses of § 550(b)(1). The Court has noted that the Foundation is an immediate or mediate transferee based on these allegations in its Order of July 24, 2012 [D.E. 23]. This Court struck the Foundation's affirmative defense that the Trustee lacked standing to recover transfers made by Scott Rothstein from his personal account because "the Complaint alleges that the [Foundation] received a transfer of money from Scott Rothstein that originated with RRA. The Trustee alleges that the Defendant is an immediate or mediate transferee." [D.E. 23].

The Foundation need not prove that RRA received the benefit of these transfers, but only that the Foundation provided value. The inquiry for an immediate or mediate transferee under § 550 is "value" not "value to the debtor." *Bonded Fin. Servs., Inc. v. European Am. Bank,* 838 F.2d 890, 897 (7th Cir.1988) (the inquiry under § 550 is not what the debtor received, but what the transferee gave up). Unlike § 548(c), § 550(b)(1) does not require that the value given by the subsequent transferee be given to the debtor. *Id.* Since a subsequent transferee receives the transfer from someone other than the debtor, absent peculiar circumstances, it would be unreasonable for one to expect a subsequent transferee to provided value to the debtor in exchange for the transfer." *Id.* The Foundation meets all requirements under § 550(b) that it took the transfers for value, in good faith, and without knowledge of the voidability of the transfer. The very nature of a public auction in a competitive marketplace establishes the items reasonably equivalent value. *See In re Hemstreet,* 258 B.R. at 139.

### CONCLUSION

Accordingly, it is

**ORDERED** that The Dan Marino Foundation's Motion for Summary Judgment is **GRANTED.**