15-3124-cv
Trustees of the Upstate New York Engineers Pension Fund v. Ivy Asset Management, et al.

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2016

(Argued: October 19, 2016     Decided: December 8, 2016)

Docket No. 15-3124

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

TRUSTEES OF THE UPSTATE NEW YORK ENGINEERS PENSION FUND,

Plaintiff-Appellant,

- v.-

IVY ASSET MANAGEMENT, LAWRENCE SIMON, HOWARD WOHL, and
BANK OF NEW YORK MELLON CORPORATION,

Defendants-Appellees.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Before:        KEARSE, JACOBS, and POOLER, Circuit Judges.

The Board of Trustees of the Upstate New York Engineers Pension Fund

sues the fund's investment manager, alleging breach of fiduciary duty in failing

to advise the fund in 1998 that it had become imprudent to continue as a

customer of Bernard L. Madoff Investment Securities LLC.  The Trustees also sue

Bank of New York Mellon Corporation, alleging that it knowingly participated in the fiduciary breach. The United States District Court for the Southern District of New York (Gardephe, J.) dismissed the Trustees' complaint for failure to state a claim and for failure to allege an actual injury sufficient to establish Article III standing. Affirmed.

LOUIS P. MALONE III, O'Donoghue & O'Donoghue LLP, Washington, D.C. (Jennifer R. Simon; and James L. Linsey, Linsey Law Firm, PLLC, New York, NY, on the brief), for Plaintiff-Appellant.

LEWIS J. LIMAN (Jeffrey A. Rosenthal, on the brief), Cleary Gottlieb Steen & Hamilton LLP, New York, NY, for Defendants-Appellees.

DENNIS JACOBS, Circuit Judge:

An ERISA pension fund, by its trustees, sues its investment manager (and principals), alleging: that these defendants knew by 1998 that investing with Bernard L. Madoff Investment Securities LLC ("BLMIS") was imprudent; that these defendants breached their fiduciary duty by failing to warn the fund of this fact; that if warned, the fund would have withdrawn the full sum appearing on its 1998 BLMIS account statements; and that prudent alternative investment of

that sum would have earned more than the fund's actual net withdrawals from its BLMIS account between 1999 and 2008. The trustees seek to obtain the difference by way of damages, among other remedies. The trustees also sue Bank of New York Mellon Corporation, which acquired the investment manager in 2000, alleging that it knowingly participated as a non-fiduciary in the fiduciary breach. They appeal from a judgment of the United States District Court for the Southern District of New York (Gardephe, J.), dismissing their complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) and for failure to allege an actual injury sufficient to establish Article III standing pursuant to Federal Rule of Civil Procedure 12(b)(1).

**I**

Unless otherwise noted, all facts are taken from the first amended complaint (the "complaint").

In 1990, Ivy Asset Management ("Ivy") agreed with the Trustees of the Upstate New York Engineers Pension Fund (the "Plan") to serve as an investment manager and provide advice in the investment of Plan assets. Ivy, which was formed and run by defendants Lawrence Simon and Howard Wohl, continued in this role until 2009. The Plan paid Ivy an annual "basic fee" as well

3

as a "performance fee" equal to a percentage of investment profits above a target threshold. App'x 101, 142. Guided by Ivy, the Trustees invested a portion of Plan assets with BLMIS (Bernie Madoff's investment advisory business) starting in 1990 and continuing until December 2008, when the Madoff Ponzi scheme was exposed.

As this court well knows, BLMIS conducted no actual securities or options trading on behalf of its customers. Instead,

> BLMIS deposited customer investments into a single commingled checking account and, for years, fabricated customer statements to show fictitious securities trading activity and returns ranging between 10 and 17 percent annually. When customers sought to withdraw money from their accounts, including withdrawals of the fictitious profits that BLMIS had attributed to them, BLMIS sent them cash from the commingled checking account.

Picard v. Ida Fishman Revocable Tr. (In re Bernard L. Madoff Inv. Sec. LLC), 773 F.3d 411, 415 (2d Cir. 2014).

Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., Ivy, Simon, and Wohl owed fiduciary duties to the Plan. We start from the allegation that they breached these duties beginning in December 1998 by concealing their well-founded belief that investing with BLMIS was imprudent. It is not alleged that Ivy, Simon, or Wohl knew that Madoff was

4

operating a Ponzi scheme, only that they knew that his investment strategy was incoherent and his representations regarding his supposed trades were inconsistent with publicly available information. In 1998, Ivy expressed general concerns about Madoff's operations and sought to limit the Plan's investment with BLMIS, but it did not advise the Trustees to get out.

Ivy, Simon, and Wohl allegedly concealed their doubts about Madoff "so as to maintain [Ivy's] assets under management and receive the fees generated by these assets." App'x 71. Performance fees linked to the Plan's BLMIS investment totaled $1.8 million after December 1998.

The chart below summarizes the Plan's BLMIS investments and withdrawals from the initial date.[1] As the chart reflects, the Plan's withdrawals exceeded investments beginning in 2002. By December 2005, after which date the Plan made no further investments or withdrawals, the Plan had withdrawn nearly $33 million more than it had invested.

---

[1] Although not all of the information in this chart is listed in the complaint, the parties have agreed that it is accurate.

5

| Date | Event | Net Investment/Profit |
|---|---|---|
| 1990 – May 1997 | Invested $13,085,201 | $13,085,201 net investment |
| June 1997 | Withdrew $359,943 | $12,725,258 net investment |
| March 1998 | Withdrew $7,000,000 | $5,725,258 net investment |
| January 1999 | Invested $2,300,000 | $8,025,258 net investment |
| April 1999 | Invested $4,000,000 | $12,025,258 net investment |
| March 2000 | Withdrew $7,000,000 | $5,025,258 net investment |
| September 2000 | Withdrew $5,000,000 | $25,258 net investment |
| March 2002 | Withdrew $6,000,000 | $5,974,742 net profit |
| December 2002 | Withdrew $3,000,000 | $8,974,742 net profit |
| June 2003 | Withdrew $10,000,000 | $18,974,742 net profit |
| December 2004 | Withdrew $7,000,000 | $25,974,742 net profit |
| December 2005 | Withdrew $7,000,000 | $32,974,742 net profit |

In November 2010, the bankruptcy trustee for BLMIS attempted to claw back the nearly $33 million in net profit withdrawn by the Plan, but was frustrated by the intervening statute of limitations.

As of December 1998 (when it is alleged the Plan would have pocketed its profits if well-advised), the Plan's investment with BLMIS (net of withdrawals) was $5,725,258. At that point, the stated value of its BLMIS account was $36,629,757 -- though, because BLMIS was a Ponzi scheme, this account entry was fictitious. Nonetheless, as the Trustees point out, as long as BLMIS had adequate funds in hand, the entire $36,629,757 could have been withdrawn -- nearly $31 million more than the Plan's net investment -- and could then have

6

been invested elsewhere.

Instead of withdrawing and reinvesting the $36,629,757 stated value of the BLMIS account in December 1998, the Trustees invested an additional $6,300,000 over the next year (on top of the $5,725,258 net investment at that time) and then withdrew $45,000,000 over the following six years, for a net profit of $32,974,742. These withdrawals, however, did not deplete the stated value of the Plan's BLMIS account, which grew apace. When Madoff's fraud was exposed in December 2008, the stated value of the account exceeded $50 million. But because the Plan was a "net winner" in Madoff's fraud -- that is, it had withdrawn more than it invested -- it could not recover any of these fictitious funds in BLMIS's liquidation.

Of the four counts in the complaint, three assert claims against Ivy, Simon, and Wohl: that they breached the duty of prudence, the duty of loyalty, and the duty to administer the Plan in accordance with its governing documents. In connection with these breach-of-duty claims, the Trustees allege the following injuries: (1) the Plan lost the opportunity to withdraw the full stated value of its BLMIS account in December 1998 and invest the (largely notional) $36,629,757 elsewhere; (2) the Plan paid Ivy $1.8 million in performance fees, some or all of

7

which related to imaginary or unrecoverable profits; (3) the Trustees increased Plan members' vested pension fund benefits in July 1999 (acting in part on the mistaken belief that the stated performance of the BLMIS account reflected reality), a step they allege they would not have taken if Ivy, Simon, or Wohl had dissuaded them from continuing to maintain an account with BLMIS; (4) the Plan incurred the expense of responding to subpoenas issued by the United States Department of Labor and the Attorney General of the State of New York related to the Plan's investment with BLMIS; and (5) the Plan incurred legal and related expenses defending against the clawback litigation initiated by the BLMIS bankruptcy trustee.

In addition to these alleged injuries, the Trustees seek disgorgement of the $200 million earned by Simon and Wohl when Bank of New York Mellon Corporation ("BNY Mellon") acquired Ivy in 2000. The Trustees allege that the reason Ivy, Simon, and Wohl concealed negative information about Madoff was that they feared the Trustees' withdrawal of the BLMIS investment would reduce Ivy's assets under management and, by extension, its acquisition value.

The fourth count is pled against BNY Mellon. Without claiming that BNY Mellon itself assumed a fiduciary duty to the Plan as a consequence of its

8

acquisition of Ivy, the Trustees allege that BNY Mellon knowingly participated in the fiduciary breach "[b]y virtue of its acquiescence and its receipt of the investment advisory fees paid by the Plan." App'x 90-91. In connection with this count, the Trustees seek disgorgement of those fees as well as any profits earned by Simon and Wohl as a result of their fiduciary breach.[2]

In September 2015, the complaint was dismissed for lack of Article III standing pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1) and, in the alternative, for failure to state a claim pursuant to Rule 12(b)(6). The district court held that the Plan suffered no legally cognizable injury because it had no right to fictitious profits and because its gains exceeded the performance fees and legal expenses relating to the BLMIS investment. Trs. of the Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt., 131 F. Supp. 3d 103, 121-26 (S.D.N.Y. 2015). The district court further ruled that: (1) the Trustees' claim regarding increased pension benefits failed because Ivy, Simon, and Wohl were not involved in that

---

[2] Significantly, the complaint does not seek disgorgement of investment advisory fees in connection with the first three counts (alleging breach of fiduciary duty by Ivy, Simon, and Wohl). Evidently for that reason, the district court's analysis of the claims against Ivy, Simon, and Wohl treated these fees as alleged losses sought to be recovered and not profits sought to be disgorged. The Trustees do not challenge that treatment in their briefs; they explicitly state that it is correct.

9

decision, id. at 126-27; (2) the claim for disgorgement of Simon and Wohl's $200 million failed because the Trustees inadequately alleged a causal connection between the breach of fiduciary duty and BNY Mellon's acquisition of Ivy, id. at 127-30; and (3) the claim against BNY Mellon failed because BNY Mellon's acquiescence and receipt of fees did not amount to participation in the fiduciary breach, id. at 130-32. On appeal, the Trustees challenge each of these holdings.

**II**

We review de novo the grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim, accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 179 (2d Cir. 2014).

The same standards apply to dismissals for lack of standing pursuant to Rule 12(b)(1) when, as here, the district court based its decision solely on the allegations of the complaint and the undisputed facts evidenced in the record. Rajamin v. Deutsche Bank Nat'l Tr. Co., 757 F.3d 79, 84-85 (2d Cir. 2014). In order to establish standing: "(1) the plaintiff must have suffered an injury-in-fact; (2) there must be a causal connection between the injury and the conduct at issue; and (3) the injury must be likely to be redressed by a favorable decision."

Kendall v. Emps. Ret. Plan of Avon Prods., 561 F.3d 112, 118 (2d Cir. 2009) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). In a case arising under ERISA, a plaintiff "must allege some injury or deprivation of a specific right that arose from a violation of [an ERISA] duty in order to meet the injury-in-fact requirement." Id. at 121.

**III**

ERISA affords a private right of action for breach of fiduciary duty under that statute:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a).

The Trustees seek both to recover alleged losses sustained by the Plan and to disgorge alleged profits made by Simon and Wohl as a result of the breach of fiduciary duty.

11

**A. Loss of Fictitious Profits**

"If, but for the breach, the [plan] would have earned even more than it actually earned, there is a 'loss' for which the breaching fiduciary is liable." Dardaganis v. Grace Capital Inc., 889 F.2d 1237, 1243 (2d Cir. 1989). Losses are measured by the difference between the plan's actual performance and how the plan would have performed if the funds had been invested "like other funds being invested during the same period in proper transactions." Donovan v. Bierwirth, 754 F.2d 1049, 1056 (2d Cir. 1985). "Where several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these." Id.

The Trustees contend that if Ivy, Simon, or Wohl had warned them in December 1998 that investing with Madoff was imprudent, the Plan could have cashed out the entire $36,629,757 stated value of the BLMIS account and thereby realized almost $31 million in profit, which, when invested prudently, would have yielded a greater return than the nearly $33 million in profit they incrementally withdrew over the course of the next seven years. The flaw in this argument is that it is incontestable that any amount withdrawn in excess of the Plan's net investment would have been money taken from other BLMIS

12

customers through a fraudulent transfer. See Picard, 773 F.3d at 421-22 ("these transfers were . . . made 'in connection with' a Ponzi scheme and, as a result, were fraudulent"); Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.), 256 B.R. 664, 682 (Bankr. S.D.N.Y. 2000) (noting "the universally-accepted rule that investors may retain distributions from an entity engaged in a Ponzi scheme to the extent of their investments, while distributions exceeding their investments constitute fraudulent conveyances").

The loss of an opportunity to lay hands on funds belonging to others is not a legally cognizable injury. In this case, it is a missed chance for innocent enjoyment of a fraud. A court of equity "will not lend its power to assist or protect a fraud." Kitchen v. Rayburn, 86 U.S. 254, 263 (1873). We therefore decline to measure loss based on the amount of other investors' money that the Plan could have withdrawn had it maximized its potential gains in Madoff's Ponzi scheme. Cf. In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d 229, 235 (2d Cir. 2011) ("Use of the Last Statement Method in this case would have the absurd effect of treating fictitious and arbitrarily assigned paper profits as real and would give legal effect to Madoff's machinations.").

As a practical matter, the Trustees are correct that had they withdrawn the

13

nearly $31 million in fictitious profits from the Plan's BLMIS account in December 1998, they would have been able to keep it. But that is not because the transfer would have been non-fraudulent; it is because the law values finality. By the time the BLMIS bankruptcy trustee attempted to claw back funds from net winners in 2010, any recovery from the Plan for the benefit of victims was defeated by invocation of the statute of limitations. In fact, this statute of limitations served to protect the nearly $33 million in profit the Plan withdrew from BLMIS prior to 2006 from clawback by the BLMIS bankruptcy trustee. The transfer would likewise have been shielded from avoidance in bankruptcy because it would have been classified as a "settlement payment" made "in connection with a securities contract" under Section 546(e) of the Bankruptcy Code, 11 U.S.C. § 546(e). Picard, 773 F.3d at 421-22 (internal quotation marks omitted). As this Court has explained:

> These statutes of limitations reflect that, at a certain point, the need for finality is paramount even in light of countervailing equity considerations. Similarly, by enacting § 546(e), Congress provided that, for a very broad range of securities-related transfers, the interest in finality is sufficiently important that they cannot be avoided by a bankruptcy trustee at all, except as actual fraudulent transfers under § 548(a)(1)(A).

Id. at 423. The funds the Trustees would like to have withdrawn in 1998 were

not withdrawn. No interest (equity, finality, or the merits) is served by giving real effect to a fraud because an innocent party would have gotten away with it.

It therefore does not matter whether (as the complaint claims) the Plan would have received greater returns by withdrawing the full $36,629,757 stated value of its BLMIS account in December 1998 and investing the money in a prudent alternative investment. Of course, the Plan did have a right to its net investment, which in December 1998 was $5,725,258. But the Trustees do not allege that had *this* money been withdrawn and invested elsewhere, the profits earned would have exceeded the Plan's BLMIS profits, which ultimately totaled $32,974,742 in 2005 (after which no further investments or withdrawals were made).

Even if the Trustees had explicitly alleged in their complaint that the investment of $5,725,258 in a prudent alternative investment would have earned more than the $32,974,742 earned in profit from BLMIS, such a claim would fail the test of plausibility. A cause of action under <u>Donovan</u>'s prudent alternative investment theory requires pleading that the ERISA-protected plan suffered a loss as a result of certain funds being invested in an imprudent manner and that, had the funds been available for other investments, those investments would

15

have *earned more* than the imprudent investment *actually earned*. <u>Donovan</u>, 754 F.2d at 1056. As we have previously observed, however, "the profits recorded over time [by BLMIS] on the customer statements were after-the-fact constructs that were . . . rigged to reflect a steady and upward trajectory in good times and bad[.]" <u>In re Bernard L. Madoff Inv. Sec. LLC</u>, 654 F.3d at 238. In other words, Madoff's Ponzi scheme was successful because BLMIS was posting far higher returns than any other investment, returns which the Trustees were able to realize by withdrawing nearly $33 million in pure profit from their investment before the Ponzi scheme was revealed. Since Madoff was able to post such high returns only because of his fraud, it would be implausible to read the complaint here to allege that any of the Plan's non-fraudulent alternative investments would have realized higher returns between December 1998 and December 2005.

Indeed, any such comparable profit would have been extremely difficult to achieve. A generous 10 percent annual compounded return on a $5,725,258 investment in 1998 would have yielded a profit of about $5.4 million by 2005 -- approximately $27.5 million less than what the Plan pocketed. Even an astronomical 25 percent annual return on investment would have fallen roughly

$11.4 million short.[3]  The Trustees have not claimed that any of the Plan's alternative investment options offered returns as high as 25 percent every year between 1998 and 2005.  Nor is such a rate of return plausible.  The valid measure is a prudent alternative investment, not an alternative Ponzi scheme.

True, this ruling affords no remedy on this claim notwithstanding the alleged breach of fiduciary duty in the rendering of investment advice.  But there is no cognizable investment loss.  And a breach of fiduciary duty under ERISA in and of itself does not "constitute an injury-in-fact sufficient for constitutional standing."  Kendall, 561 F.3d at 121.  Accordingly, the Plan has failed to allege facts sufficient to show Article III standing.

**B.  Performance Fees and Legal Expenses**

The Trustees claim as additional losses: (1) the $1.8 million in performance fees paid to Ivy in connection with the Plan's BLMIS investment after 1998; and (2) the costs incurred responding to the unsuccessful clawback action filed by the Madoff bankruptcy trustee and to the subpoenas issued by the United States Department of Labor and the Attorney General of the State of New York in their

---

3 These calculations do not even take into account the potential returns the Plan could have made by investing its periodic withdrawals from BLMIS prior to 2005.

actions against Ivy, Simon, and Wohl.[4]

Under the common law of trusts -- which "offers a starting point for analysis of ERISA unless it is inconsistent with the language of the statute, its structure, or its purposes," Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc., 530 U.S. 238, 250 (2000) (internal quotation marks and alterations omitted) -- the "loss occasioned by one breach of trust" is not offset by "a gain which has accrued through another and distinct breach of trust." Restatement (Second) of Trusts § 213 (1959). However, where, as here, the alleged "breaches of trust are not distinct, the trustee is accountable only for the net gain or chargeable only with the net loss resulting therefrom." Id.; see also Cal. Ironworkers Field Pension Tr. v. Loomis Sayles & Co., 259 F.3d 1036, 1047 (9th Cir. 2001) ("[A] fiduciary is liable for the total aggregate loss of all breaches of trust and may reduce liability for the net loss of multiple breaches only when such multiple breaches are so related that they do not constitute separate and distinct

---

4 It is possible that the Trustees would have had to respond to the clawback action and subpoenas even if they had withdrawn the Plan's BLMIS investment in 1998 because the Plan would still have received fraudulent transfers and the Trustees could still have had information relevant to the government investigations into Ivy, Simon, and Wohl. However, because it does not affect the outcome of the case, we assume for present purposes that these legal and compliance expenses are losses caused by the alleged breach of fiduciary duty.

breaches.").

Here, the performance fees and the legal and compliance costs that the Trustees seek to recoup arise from the same alleged breach of trust that imprudently left the Plan invested in BLMIS. The question becomes whether the performance fees and the legal and compliance costs, added together, exceed the profit that the Plan derived in excess of what it would have made from a prudent alternative investment.

The last investment or withdrawal made in connection with the Plan's BLMIS account occurred in December 2005 (the stated value that remained, which was imaginary anyway, was erased when the Ponzi scheme was uncovered in December 2008). Based on the total investments and withdrawals (i.e., through December 2005), the Plan earned a profit of $32,974,742. As discussed above, the Trustees have not alleged, nor is it plausible, that if they had been duly warned about BLMIS in December 1998 and then withdrawn the $5,725,258 principal to which they were entitled, the Plan could have obtained a profit anywhere near this large through a prudent alternative investment. Even an implausible 25 percent annual return would have fallen short over $11 million.

19

It is also wholly implausible that the performance fees and legal expenses the Trustees claim as losses could have amounted to more than a few million dollars. Although the exact costs incurred responding to the clawback action and subpoenas are not stated in the complaint, one can safely conclude that these costs, when combined with the $1.8 million paid in performance fees, do not come close to matching the extraordinary profits made by the Plan's BLMIS investment over and above what it could have made through a prudent alternative investment. Indeed, it is inconceivable that legal expenses relating to a clawback action that was barred by the statute of limitations and subpoenas asking for information about an investment would amount to many millions of dollars. Therefore, because the Trustees have not plausibly alleged losses in excess of their profits, they have not pleaded an injury in fact sufficient for Article III standing. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (requiring a complaint to "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" (internal quotation marks omitted)).

**C. Increased Pension Fund Benefits**

The Trustees claim that the Plan suffered an additional loss when pension fund benefits were increased in 1999 in partial reliance on the stated

20

performance of the BLMIS investment. It is alleged that this increase was unwarranted because it was predicated on fictitious stated values of investments that eventually became worthless, and that it reduced Plan assets and compromised the Plan's ability to pay promised retirement benefits. Since, according to the complaint, the Trustees would not have increased pension fund benefits had they known that investing with BLMIS was imprudent, they hold Ivy, Simon, and Wohl responsible for the cost of the benefit increase under 29 U.S.C. § 1109(a).

The complaint does not allege that the Plan has been or will be unable to pay the increased benefits to its participants. Although the Plan may have less of a surplus than the Trustees expected when they increased benefits in 1999, no participants are alleged to have been harmed. Nor was the Plan itself harmed; the Plan received funds far in excess of its entitlement. Therefore, the increase in pension benefits does not constitute a cognizable loss.

The district court rejected this alleged loss for a different reason, namely that Ivy, Simon, and Wohl could not be held liable because they had no involvement in the decision to increase benefits. Trs. of the Upstate N.Y. Eng'rs Pension Fund, 131 F. Supp. 3d at 127. Because we conclude that the increase in

21

pension benefits does not constitute a cognizable loss, we need not decide that additional issue.

**D. Disgorgement of Simon and Wohl's $200 Million**

The Trustees further seek disgorgement of the $200 million that Simon and Wohl shared when BNY Mellon acquired Ivy. The Trustees argue that this money was the fruit of Simon and Wohl's breach of fiduciary duty because Ivy's value as an acquisition target depended in part on its assets under management, which Simon and Wohl feared would decrease if they disclosed to the Trustees their complete and honest conclusions about Madoff. However, although the complaint alleges that the Trustees would have divested from BLMIS if Simon and Wohl had disclosed these conclusions, it does not allege that the Trustees would have removed the assets from Ivy's management. There is therefore no reasonable inference that Simon and Wohl's concealment of information about Madoff affected Ivy's acquisition price. See 29 U.S.C. § 1109(a) (permitting disgorgement of a fiduciary's profits only where there is a causal connection between those profits and use of plan assets by the fiduciary); see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level[.]").

**IV**

Finally, the Trustees allege that BNY Mellon, a non-fiduciary, knowingly participated in Ivy, Simon, and Wohl's breach of fiduciary duty "[b]y virtue of its acquiescence and its receipt of the investment advisory fees paid by the Plan." App'x 90-91.

"The well-settled elements of a cause of action for participation in a breach of fiduciary duty are 1) breach by a fiduciary of a duty owed to plaintiff, 2) defendant's knowing participation in the breach, and 3) damages." Diduck v. Kaszycki & Sons Contractors, Inc., 974 F.2d 270, 281-82 (2d Cir. 1992), abrogated on other grounds by Gerosa v. Savasta & Co., Inc., 329 F.3d 317 (2d Cir. 2003). Although the complaint adequately alleges that BNY Mellon knew of the breach of fiduciary duty, it fails to plead facts demonstrating that BNY Mellon "affirmatively assist[ed], help[ed] conceal, or by virtue of failing to act when required to do so enable[d] [the breach of fiduciary duty] to proceed." Diduck, 974 F.2d at 284. Accordingly, the complaint fails to state a claim against BNY Mellon for participation in a breach of fiduciary duty by Ivy, Simon, and Wohl.

## CONCLUSION

For the foregoing reasons, the district court's dismissal of the Trustees' complaint is affirmed.